## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JED HORWITT, ESQ., AS RECEIVER FOR SENTINEL GROWTH FUND MANAGEMENT, LLC, RADAR ALTERNATIVE FUND LP, and RADAR ALTERNATIVE MASTER FUND SPC<br><br>Plaintiff,<br><br>v.<br><br>ALAN L. SARROFF AND A.L. SARROFF MANAGEMENT, LLC<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No.<br>)   _____<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Jed Horwitt, Esq., in his capacity as Court-appointed receiver (the "Receiver") for Sentinel Growth Fund Management, LLC ("Sentinel"), Radar Alternative Fund LP ("Radar LP") and Radar Alternative Master Fund SPC ("Radar SPC" and, together with Radar LP, collectively, the "Radar Funds," and the Radar Funds together with Sentinel, collectively, the "Receivership Entities"), by and through his undersigned counsel, Zeisler & Zeisler, P.C., as and for his complaint in the above-captioned action (the "Action") against defendants  Alan L. Sarroff ("Sarroff") and A.L. Sarroff Management, LLC ("Sarroff, LLC", and collectively, the "Defendants"), alleges as follows:

## SUMMARY OF CLAIMS:

1.      This lawsuit is part of the Receiver's continuing efforts to trace, recapture and return investor proceeds misappropriated from investment funds managed and operated as a Ponzi scheme by Mark J. Varacchi ("Varacchi") and other individuals affiliated with the Receivership Entities.  Sarroff's initial involvement with Varacchi concerned a three-day loan for $7.3 million

made by him to Varacchi and Sentinel, so Varacchi and Sentinel could cover a margin call and preserve their securities trading platform with their prime broker, Weeden Prime Services, LLC ("Weeden").  Because of Varacchi's desperate circumstances, Sarroff was able to extract a "fee" in the amount of $125,000 for this three-day, virtually risk-free, loan.  Varacchi caused Sentinel to repay the $7.3 million and the $125,000 fee on November 15, 2013.  Further evidencing the lack of bona fides, Sarroff requested and received an additional $25,000 ten days after the loan was repaid.  (The $7.425 million and $25,000 amounts paid to Sarroff in exchange for the loan are collectively referred to herein as the "Sarroff Loan Transfers.")

2. Following these payments, Sarroff sought to participate in what appeared to him to be an extremely lucrative investment platform offered by Varacchi—later admitted by Varacchi, in civil and criminal proceedings, to be a Ponzi scheme.  In the following months, they discussed Sarroff's participation and, ultimately, reached a short-term arrangement for Sarroff which proved to be very profitable.  This demonstration led to a more formal Investment Management Agreement where Sarroff, LLC initially invested $1.2 million, received buying power of $4.8 million (being extended 4 times margin), and became entitled to receive 60% of the net profits realized on the investment platform.

3. Sarroff, LLC reaped the benefits of Varacchi's Ponzi scheme in the following two years never engaging in the slightest bit of due diligence to ensure the legitimacy of Varacchi's trading platform and appropriate use of its and other investors' funds—such as obtaining third-party confirmation of the investments.

4. Ultimately, in November, 2015, Sarroff, LLC's auditors requested verification of capital from Varacchi and Sentinel.  After evading numerous requests, on or about December 1,

2

2015, Varacchi confessed to Sarroff, LLC's President, Lawrence Smith, that Sarroff, LLC's funds had been commingled with other investors' funds and funds from other sources, that he had used these amounts for other purposes including for his personal use, and that he did not have, readily available, all of Sarroff, LLC's principal.

5.      In response, Sarroff, LLC, first accused Varacchi of obvious and numerous criminal acts and other wrongdoing, and threaten to go to the United States Securities and Exchange Commission (the "SEC") to report him and Sentinel.  Over the course of the following weeks, Sarroff, LLC used the perceived leverage over Varacchi to extract paydowns totaling $2,225,000, which Varacchi caused Sentinel to obtain from other sources then to pay Sarroff, LLC during the month of December, 2015.  Sarroff, LLC thereafter negotiated even better investment terms on the $1,200,000 that it decided to keep on the platform with Varacchi and Sentinel.

6.      In total, from February 19, 2014, through November 16, 2016, Varacchi, in furtherance of his Ponzi scheme, caused Sentinel to make a series of transfers to Sarroff and Sarroff, LLC in the aggregate amount of $7,767,409 (collectively, along with all other transfers of property made by Varacchi or the Receivership Entities to Sarroff and Sarroff, LLC, other than the Sarroff Loan Transfers, the "Sarroff Investment Transfers").

7.      Thus, the Sarroff Loan Transfers and the Sarroff Investment Transfers (sometimes, collectively, the "Sarroff Transfers") constitute intentional and constructive fraudulent transfers pursuant to the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §§ 52-552 *et seq.* ("CUFTA").  Accordingly, the Receiver, by this action, seeks to avoid these fraudulent transfers and recover their value for the benefit of the Receivership Estate and their creditors.

8.      Alternatively, the Receiver asserts a cause of action for unjust enrichment against Sarroff and Sarroff, LLC because he unjustly failed to pay the Receivership Entities for the benefits received for the Sarroff Loan Transfers and the Sarroff Investment Transfers, and equity and good conscience require the full restitution of the Sarroff Loan Transfers and the Sarroff Investment Transfers paid by Sentinel to Sarroff and Sarroff, LLC so they may be distributed by the Receiver to the creditors of the Receivership Estate.

**THE PARTIES:**

**The Receiver:**

9.      The Receiver is a natural person residing and doing business in Connecticut.

10.      On May 1, 2017, the United States District Court for the District of Connecticut (Bolden, J.) entered its Order Appointing Receiver (the "Receivership Order") which, *inter alia*, appointed the Receiver to serve as receiver for the Receivership Entities.

11.      The Receivership Order entered in that certain civil action captioned *Securities and Exchange Commission v. Mark J. Varacchi, et al.* (Civil Action No.: 3:17-cv-00155-VAB) (the "SEC Action").

12.      The Receivership Order authorizes the Receiver, with prior court approval and in consultation with the SEC, to, *inter alia,* "investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in his discretion, and in consultation with SEC counsel, be advisable or proper to recover and/or conserve Receivership Assets."  (Receivership Order ¶ 19.)

4

**The Receivership Entities:**

13.     Sentinel is a limited liability company organized and existing under the laws of the State of Delaware.  Sentinel's last known business address was located in Stamford, Connecticut.

14.     Radar LP is a private fund organized and existing under the laws of the State of Delaware.

15.     Radar SPC is a private fund organized and existing under the laws of the Cayman Islands.

**The Defendants:**

16.     The Defendant Sarroff is a natural person residing at 43 Meadow Woods Road, Great Neck, NY 11020.  Upon information and belief, Sarroff has been, at all relevant times, the 50% member of Sarroff, LLC.

17.     Sarroff, LLC is a limited liability company organized and existing under the laws of the State of New York.  Upon information and belief, Sarroff, LLC maintains a business address at 43 Meadow Woods Road, Great Neck, NY 11020.

## JURISDICTION AND VENUE:

**Jurisdiction and Venue in the SEC Action**

18.     On February 2, 2017, the SEC filed the SEC Action against the Receivership Entities and Varacchi in this District pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77t(d), 77v(a), Sections 21(d)(1), 21(e) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e), 78aa, and Sections 209(d), 209(e) and 214 of the Investment Advisers Act of 1940 (the "Advisers Act") 15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14.

19.     Venue is proper for the SEC Action in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, and 28 U.S.C. § 1391(d), because, among other things, certain acts or transactions constituting the violations of the federal securities laws by Varacchi and the Receivership Entities occurred in this District and because Sentinel maintained offices in Connecticut and Varacchi maintained a residence in Connecticut.

20.     Pursuant to the Receivership Order, in the SEC Action, on October 27, 2017, the Receiver requested leave to commence this Action, which this Court granted by its order entered on October 31, 2017.

**Jurisdiction and Venue in This Action**

21.     This Court has original jurisdiction over the SEC Action, to which the claims in this Action relate.  Further, this Action concerns property under the Court's exclusive jurisdiction and the Receiver has brought this Action in furtherance of his appointment and in the performance of his duties as directed by this Court.  Therefore, this Court has subject matter jurisdiction over this Action under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. §§ 754 and 1692, as well as under state law, because the Defendants have transacted business within the State of Connecticut, with Varacchi, Sentinel and others, and the Defendants have committed tortious acts within the State of Connecticut.

23.     Venue is proper in this District under 28 U.S.C. §§ 754 and 1391(b)(2), because a substantial part of the events giving rise to the Receiver's claim against the Defendants occurred within this District and because this Action is ancillary to the SEC Action.

**THE PONZI SCHEME:**

24.     From its inception in approximately September, 2013, through its discovery in December, 2016, Varacchi operated a classic Ponzi scheme defrauding various individuals and businesses into investing in certain "programs" maintained through the Radar Funds, and then using the fruits of such fraud to repay prior investors or to pay his own personal expenses and other personal liabilities.

25.     Although Sentinel and Varacchi (who owned, managed and controlled Sentinel) were engaged in the business of providing investment advice concerning securities for compensation—and, therefore, "investment advisors" within the meaning of the Investment Advisors Act of 1940, 15 U.S.C. §§ 80b-1 *et seq.*—neither Sentinel nor Varacchi was registered as an investment advisor with the SEC.

26.     Notwithstanding, Varacchi, through Sentinel, solicited investments by offering a platform through which they could invest with "up-and-coming hedge fund managers" (the "Portfolio Managers").  Varacchi purported to offer "master" funds that included multiple series managed by the Portfolio Managers.

27.     The first private "master" fund was Radar LP with the first deposit into a brokerage account for Radar LP being made on September 25, 2013.  Varacchi later formed Radar SPC and the first deposit into a brokerage account for Radar SPC was made on December 9, 2015.

28.     The Portfolio Managers were offered sub-accounts within the Radar Funds which provided the appearance—to the Portfolio Managers and the Investors—that their investments had been segregated for their exclusive benefit.

7

29.     Varacchi and Sentinel offered two distinct "programs" through the Radar Funds. The first involved a long/short equity strategy and the other involved an initial public offering investment program.  Each of these were allocated across the Portfolio Managers.

30.     At all relevant times, the aggregate amount of the Receivership Entities' liabilities far exceeded the value of their unencumbered assets.

31.     While, to a limited extent, Varacchi and various Portfolio Managers used the Radar Funds to trade in securities, the revenues generated could not repay the aggregate amounts due investors or even significant withdrawals when requested by Investors.

32.     Instead, in order to perpetuate his Ponzi scheme, Varacchi used funds received from newly defrauded investors to repay prior investors.

33.     At various times when investors sought written confirmation of their accounts and investment performance, Varacchi transferred funds between sub-accounts within the Radar Funds in order to produce statements that falsely represented to investors that their particular sub-account possessed the proceeds of their investments.

34.     Varrachi also used available margin borrowing from the prime broker for the Radar Funds to acquire positions in the sub-accounts.  By failing to disclose to investors that the securities had been purchased on margin, Varacchi falsely created the appearance that the investors' sub-accounts possessed their unencumbered assets.

35.     In total, Sentinel received $42.6 million in third party deposits between August, 2013, and December, 2016, and transferred $24.8 million to the Radar Funds. The Radar Funds received another $21.1 million directly from third parties.

36.     The Receiver has determined that approximately 25 investors who deposited funds with the Receivership Entities have unredeemed principal investments totaling approximately $20 million.

37.     The Receiver estimates that Varacchi used approximately $11 million of the Receivership Entities' funds to acquire assets for himself and to pay for his own personal expenses and other liabilities.

38.     Upon information and belief, Varacchi also misappropriated the Receivership Entities' funds for his personal purposes as follows:

     a.     Approximately $500,000 in cash withdrawals;

     b.     Approximately $50,000 in debit card withdrawals

     c.     Approximately $3.1 million in transfers to Varacchi's personal bank accounts;

     d.     Approximately $33,000 in payments to Varacchi's family members;

     e.     Approximately $3.7 million in private equity investments or loans on behalf of Varacchi;

     f.     Approximately $425,000 in payments to business partners or associates of Varacchi;

     g.     Approximately $640,000 in payments to persons or entities who made personal loans to Varacchi; and

     h.     Approximately $50,000 to a foundation that is a 501(c)(3) nonprofit organization, for which Varacchi served as a board member.

39.     As a result of Varacchi's exploitation of the Receivership Entities to operate a Ponzi scheme, and his misappropriation and diversion of the Receivership Entities' funds and other assets, Varacchi has at all relevant times been liable to the Receivership Entities, and the Receivership Entities constitute creditors of Varacchi.

40.     Furthermore, since Sentinel failed to transfer to Radar LP funds deposited with Sentinel for investment with Radar LP, and otherwise misappropriated and diverted funds in which Radar LP held an interest, and harmed Radar LP, at all relevant times, Radar LP was a creditor of Sentinel.

41.     Upon the entry of the Receivership Order in the SEC Action, the Receivership Entities were freed from Varacchi's domination and control, and the Receiver assumed control over the Receivership Entities in his place.

42.     Varacchi admitted to operating a Ponzi scheme through the Receivership Entities. Varacchi consented to the entry of Judgment in favor of the SEC in the SEC Action and, in the separate criminal proceeding pending before the Southern District of New York, pled guilty to criminal conduct relating to certain matters alleged in the Complaint commencing the SEC Action. (*See* SEC Action, Doc. No. 11-1, Consent to Entry of Judgment of Defendants Mark J. Varacchi and Sentinel Growth Fund Management, LLC and Relief Defendants Radar Alternative Fund LP and Radar Alternative Master Fund SPC.)  More specifically, in *United States v. Varacchi*, Crim. No. 1:17-cr-00076-NRB (S.D.N.Y.), Varacchi pleaded guilty to a criminal information charging him with counts of securities fraud, wire fraud, and conspiracy to commit securities and wire fraud. "The criminal information charged Defendant Varacchi with misappropriating, for the benefit of himself and others, funds that investors provided Sentinel for the purchase and sale of securities,

and then obtaining funds from other investors in order to make payments to investors whose funds he had misappropriated."  (*Id*. ¶ 2.)

43.     Based, in part, upon Varacchi's consent to judgment, on May 1, 2017, the District Court in the SEC Action entered its Judgment as to Defendants Mark J. Varacchi and Sentinel Growth Fund Management, LLC and Relief Defendants Radar Alternative Fund LP and Radar Alternative Master Fund SPC.

## THE FRAUDULENT TRANSFERS:

44.     Sarroff initially became involved with Varacchi in November, 2013.  Sentinel's and Radar LP's prime broker, Weeden, had issued a margin call in the amount of $1.3 million, and suspended the extension of any further margin in the Radar LP account.  Notwithstanding the suspension of margin, the following day, certain managers for a particular investor caused additional trades to be booked in the Radar LP account resulting in a second margin call in the amount of $7.3 million.

45.     To satisfy the margin call, Varacchi sought to borrow $7.3 million from Sarroff for a period of three days.  Sarroff demanded, in exchange, a "fee" in the amount of $125,000.  Because of Varacchi's desperate circumstances and desire to continue to maintain his investment platform, Varacchi agreed.  The loan terms with Sarroff were not the result of an arms-length bargain.

46.     The loan was virtually risk-free because, while it was necessary to cover Weeden's margin call in the Radar, LP account that the securities purchases had caused, those purchases had been sold the same day and merely needed to settle to fully cover the amount of margin extended.

47.     On November 12, 2013, Sentinel received the $7.3 million loan from Sarroff.

48.     The securities purchases and sales, in fact, cleared, and on November 15, 2013, Varacchi caused Sentinel to repay the $7.425 million and, thereby, perpetuated his Ponzi scheme.

49.     Sarroff then extracted an additional $25,000 on account of having provided this three-day loan, which Varacchi caused Sentinel to pay on November 25, 2013.  The combined interest charges amounted to interest at the rate of 246.6% on an annualized basis.  Varacchi agreed to these terms and caused Sentinel to make the Sarroff Loan Transfers in order to maintain his investment platform with Weeden, and thereby further his Ponzi scheme.

50.     Upon learning about Varacchi's platform and, in particular, his initial public offering trading strategy (with no overnight risk), and its perceived ability to generate tremendous profits, Sarroff sought to participate.

51.     Sarroff, initially invested $400,000 on February 5, 2014.  He agreed to receive in return 50% of the net profits realized on his investment through the IPO trading platform and Sentinel's managers plus interest at the rate of 10% per annum **and** a flat "fee" in the amount of $15,100 (to ensure a guaranteed return).  Sarroff's investment was due to be returned on February 19, 2014.

52.     In two weeks, Sarroff had realized $4,696.86 in net trading profits (representing his 50% share) plus the $15,100 "fee" for a total purported return of $19,794.86.  On February 19, 2014, Varacchi caused Sentinel to wire him this amount.

53.     On March 7, 2014, Varacchi caused Sentinel to wire Sarroff $415,195.80 allegedly representing the return of the original investment, the balance of his share of the profits and accrued interest.

12

54.     During this time frame, Sarroff and Varacchi discussed entering into a longer-term relationship where Sarroff, through his entity, Sarroff LLC, would invest in Varacchi's platform and managers.

55.     Upon information and belief, effective as of March 3, 2014, Sentinel and Sarroff, LLC entered into a certain Investment Management Agreement (the "IMA") which appointed Sentinel to serve as the "Investment Manager" for Sarroff, LLC to invest securities, cash and/or other assets with respect to a discretionary advisory account (the "Sarroff Account"). Custody of the Sarroff Account was to be maintained by Industrial and Commercial Bank of China ("ICBC").

56.     The IMA expressly provided that Sentinel was not to have custody of any assets in the Sarroff Account. Sentinel was precluded by the IMA from withdrawing any of the contributed funds from the Sarroff Account without the written approval of Sarroff, LLC, except as authorized pursuant to the fee arrangement.

57.     The IMA provided for fees due the managers to be negotiated at a set percentage of between 40% and 60% of the profit realized. The IMA then provided that Sarroff, LLC would receive 60% of the net profits and Sentinel would receive 40% of them.

58.     The IMA further provided that the initial allocation of buying power to the Sarroff Account would be $4,800,000 based on a $1,200,000 contribution made by Sarroff, LLC – a margin that was four times the amount of Sarroff, LLC's contribution.

59.     In fact, there never was any "Sarroff Account." Instead, Varacchi deposited funds received from Sarroff, LLC into the account maintained in the name of Radar, LP (with Weeden acting as the prime broker and ICBC carrying the account and serving as the account custodian). Upon the deposit of the funds received from Sarroff, LLC, Varacchi, who exercised custody and

control over all of the assets in the Radar, L.P. account, commingled these funds with funds from other Investors and lenders. Varacchi also repeatedly caused Sentinel to withdraw funds from the Radar, L.P. account for his own personal purposes.

60.     Sarroff and Sarroff, LLC failed, refused and neglected to exercise even the most minimal degree of due diligence and oversight with respect to Sarroff, LLC's investments and trades, and the Sarroff Account including, but not limited to, obtaining, at various times, third-party verification of all transactions and assets in the Sarroff Account. There was, simply, a complete lack of diligent inquiry on the part of Sarroff and Sarroff, LLC both before making their investments and at all relevant times while Varacchi and Sentinel held them.

61.     Upon information and belief, the relationship between Varacchi and Sentinel, on the one hand, and Sarroff and Sarroff, LLC, continued "business as usual" through November, 2015. During this time frame, Varacchi caused Sentinel to distribute purported "profits" to Sarroff, LLC, and, from time to time as requested, caused Sentinel to repay principal amounts deposited by Sarroff, LLC.

62.     In November, 2015, auditors of the Sarroff, LLC fund sought verification of the capital invested in Sentinel. In the weeks that followed, Varacchi repeatedly evaded fulfilling this request.

63.     Ultimately, on or about December 1, 2015, Varacchi explained to Lawrence Smith ("Smith"), the President of Sarroff, LLC, that the funds invested by Sarroff, LLC had been commingled with other investor funds, and, in part, had been withdrawn and used for other purposes.

14

64.     In response, on December 2, 2015, Smith stated the following in an email to Varacchi:

I was very concerned at the last phone conversation I had with you, (Mark) so I want both of you to clearly understand the urgency of recovering the capital immediately.

Fact, you both clearly committed serious criminal and civil acts, including under the civil RICO statute. You created a fraudulent financial statement which incorporated a government regulated brokerage firm's name and likeness. You have committed interstate wire fraud on at least 3 occasions. You have breached our Investor Management Agreement (attached) by removing 3/4 of the capital from the designated custodian, (ICBC) without authorization of any kind. You have recklessly taken those unauthorized funds and apparently given them to unknown entities for your own personal gain. This unauthorized placement of our funds is completely outside the scope of the investment strategy in Schedule A (Allocating capital to sub-advisors deploying low volatility day trading strategies that include investing in syndicate calendar). You have also violated the agreement's liquidity and overnight holding strategy. Those blatant criminal acts were discovered without subpoenaing bank records, brokerage firms, personal or corporate income, email accounts, cell phone records and deposing anyone who might have knowledge of this matter, which is something I would like to avoid.

65.     Smith, on behalf of Sarroff, LLC, also repeatedly threatened to report Varacchi and Sentinel to the SEC.

66.     Smith thereafter also demanded, on behalf of Sarroff, LLC, the disclosure of Varacchi's personal and corporate assets, and a lien against his property.

67.     Over the course of December, 2015, Sarroff, LLC sought a complete accounting of the transactions made on its behalf during 2015, and the return of a significant amount of the capital invested.  Sarroff, LLC did not, however, demand a full redemption of the invested amounts.

68.     In the month of December, 2015, Varacchi caused Sentinel to transfer $2,225,000 to Sarroff, LLC.  Sentinel did not have the funds necessary to make these transfers without the infusion of funds from other sources including Investors.

69.     For example, on December 23, 2015, Sentinel's bank account only had a balance of $2,616.35.  On that day, Varacchi obtained the investment from one of the other Investors in

15

the amount of $600,000 and deposited this amount into the Sentinel account, and then caused Sentinel to transfer to Sarroff, LLC the amount of $500,000.

70.     Similarly, on December 29, 2015, the Sentinel account started the day with a balance of $8,979.33.  That day, Varacchi secured funds from Advanced Entertainment, LLC[1] in the amount of $1,500,000, deposited them into the Sentinel account, and caused Sentinel to transfer to Sarroff, LLC, the amount of $1,400,000.

71.     Notwithstanding Sarroff, LLC's complete understanding of Varacchi's and Sentinel's investment practices—*inter alia*, commingling Investors' funds, using such funds for personal and other purposes, and lack of transparency—Sarroff, LLC did not redeem all of the funds originally invested, leaving $1,200,000 in the Radar, LP account for further investing on the IPO day trading platform.   Instead, Sarroff, LLC demanded better terms for its continued participation in the platform.

72.     Sarroff, LLC demanded that Varacchi and Sentinel would be responsible to pay prior losses and that any future losses would be reimbursed by them as well.  So, while the 60/40 split of net profits would remain in place, the 40% due Sentinel would be used first to reimburse

---

[1] Advanced Entertainment, LLC is the subject of its own SEC enforcement action, *Securities and Exchange Commission v. Joseph Meli, et al.,* No. 1:17-cv-00632-LLC, in part, related to its relationship to Varacchi and Sentinel, which action is presently pending before the U.S. District Court for the Southern District of New York ("SDNY").   On October 31, 2017, one of the responsible individuals, Joseph Meli, pled guilty to securities fraud in the criminal proceeding against him, *United States v. Steven Simmons, et al.,* 1:17-mj-00647-UA, also pending before the SDNY.   One of the allegations incorporated into the count Meli pled guilting to includes the allegation that he defrauded an investor into investing into his scheme involving the bulk purchase of tickets to a Broadway show and resale on the secondary market, but then actually used the fraudulently obtained funds to assist Varacchi in repaying the person identified as "Victim-2." Victim-2 is Sarroff, LLC.

Sarroff, LLC for all prior losses realized.  Through this structure Sarroff, LLC sought to eliminate any risk of loss.

73.     Sarroff, LLC, continued to participate in Varacchi's and Sentinel's investment platform through December, 2016 when the Ponzi scheme was uncovered by third parties.

74.     In total, from February 19, 2014, through November 16, 2016, Varacchi, in furtherance of his Ponzi scheme, caused Sentinel to make a series of transfers to Sarroff and Sarroff, LLC in the aggregate amount of $7,767,409.

75.     Sarroff and Sarroff, LLC had invested only $7,150,000 in exchange for the Sarroff Investment Transfers.

76.     Sarroff and Sarroff, LLC did not give Sentinel reasonably equivalent value in exchange for the Sarroff Loan Transfers or the Sarroff Investment Transfers.

### FIRST COUNT: INTENTIONAL FRAUDULENT TRANSFER
### (CONN. GEN. STAT. § 52-552e(a)(1)) AS TO ALL DEFENDANTS

77.     The Receiver realleges and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

78.     The Sarroff Loan Transfers and Sarroff Investment Transfers constitute transfers of interests in property by Sentinel and Radar LP within the meaning of §§ 52-552(b)(12) of CUFTA, which were improperly caused by Varacchi through his domination and control over them in furtherance of his Ponzi scheme.

79.     The Sarroff Loan Transfers and Sarroff Investment Transfers occurred during the course of the Ponzi scheme perpetrated by Varacchi, when Varacchi diverted and misappropriated Sentinel's and Radar LP's corporate assets and commingled investor money among the insolvent Sentinel and Radar LP entities.  The Sarroff Transfers were made with money misappropriated

17

and diverted from Sentinel and Radar LP by Varacchi.  Varacchi directed the Sarroff Transfers through Sentinel at a time when Sentinel and Radar LP were insolvent.  Accordingly, at all relevant times herein, Sentinel and Radar LP had a claim to the funds used to make the Sarroff Transfers.

80.     At all relevant times, Sentinel and Radar LP were "creditors" of Varacchi within the meaning of § 52-552(b)(4) of CUFTA, and Radar LP was a "creditor" of Sentinel.

81.      Each of the Sarroff Loan Transfers and Sarroff Investment Transfers was made to or for the benefit of each of the Defendants.

82.     Varacchi sought to conceal the Sarroff Transfers.

83.     Sarroff, LLC, by its President, Smith, threatened Varacchi to contact the authorities for the purpose of inducing him to make a substantial portion of the Sarroff Transfers.

84.     In substantial part, at the time of the Sarroff Transfers, the transferred funds constituted substantially all of Sentinel's assets.

85.     Varacchi and, through Varacchi's domination and control, Sentinel absconded with the funds necessary to make the Sarroff Transfers.

86.     The value of the consideration received by Sentinel and Radar LP in exchange for the Sarroff Transfers was not reasonably equivalent to the value of the property transferred and the obligations incurred.

87.     Sentinel and Radar LP were insolvent at the time the Sarroff Transfers were made.

88.     In substantial part, the Sarroff Transfers occurred shortly before or shortly after substantial debt was incurred by the Receivership Entities.

89.     The Sarroff Transfers were made by Varacchi and others to further and perpetuate the Ponzi scheme operated through the Receivership Entities, and were made with the actual intent to hinder, delay or defraud some or all of the Receivership Entities' then-existing creditors.

90.     The Sarroff Loan Transfers and Sarroff Investment Transfers were (i) made on or within four years before the date of this Action or (ii) were discovered, and could only have been reasonably discovered, by the Receiver within one year before the date of this action.

91.     The Sarroff Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to § 52-552e(a)(1) of CUFTA and the Sarroff Transfers are recoverable from the transferees, Sarroff and Sarroff, LLC pursuant to § 52-552h of CUFTA.

92.     As a result of the foregoing, pursuant to Conn. Gen. Stat. §§ 52-552e(a)(1), 52-552h and 52-552i(b), the Receiver is entitled to a judgment against the Defendants: (i) avoiding the Sarroff Transfers; (ii) recovering the Sarroff Transfers, or the value thereof, from the transferees, the Defendants, or each of the Defendants to the extent they were the person for whose benefit the transfer was made, and (iii) for such other remedies enumerated in § 52-552h.

### SECOND COUNT: CONSTRUCTIVE FRAUDULENT TRANSFER (CONN. GEN. STAT. § 52-552e(a)(2)) AS AGAINST ALL DEFENDANTS

93.     The Receiver realleges and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

94.     Sentinel and Radar LP did not receive reasonably equivalent value in exchange for making the Sarroff Transfers.

95.     Varacchi caused Sentinel and Radar LP to make the Sarroff Transfers at a time when Sentinel and Radar LP were engaged or were about to engage in a business or a transaction for which the remaining assets of Sentinel and Radar LP were unreasonably small in relation to

19

the business or transaction, or Sentinel and Radar LP intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

96.     The Sarroff Loan Transfers and Sarroff Investment Transfers constitute fraudulent transfers within the meaning of, and in violation of Conn. Gen. Stat. § 52-552e(a)(2).

97.     As a result of the foregoing, pursuant to Conn. Gen. Stat. §§ 52-552e(a)(2), 52-552h and 52-552i(b), the Receiver is entitled to a judgment against the Defendants (i) avoiding the Sarroff Transfers; (ii) recovering the Sarroff Transfers, or the value thereof, from the transferees, the Defendants, or each of the Defendants to the extent they were the person for whose benefit the transfer was made, and (iii) for such other remedies enumerated in § 52-552h.

### THIRD COUNT: CONSTRUCTIVE FRAUDULENT TRANSFER (CONN. GEN. STAT. § 52-552(f)) AS AGAINST ALL DEFENDANTS

98.     The Receiver realleges and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

99.     Varacchi caused Sentinel and Radar LP to make the Sarroff Transfers at a time when they were insolvent, or Sentinel and Radar LP became insolvent as a result of the transfer and obligations incurred.

100.    The Sarroff Transfers constitute fraudulent transfers within the meaning of, and in violation of Conn. Gen. Stat. § 52-552f.

101.    As a result of the foregoing, pursuant to Conn. Gen. Stat. §§ 52-552h and 52-552i(b), the Receiver is entitled to a judgment against the Defendants (i) avoiding the Sarroff Transfers; (ii) recovering the Sarroff Transfers, or the value thereof, from the transferees, the Defendants, or each of the Defendants to the extent they were the person for whose benefit the transfer was made, and (iii) for such other remedies enumerated in § 52-552h

## FOURTH COUNT: UNJUST ENRICHMENT
## AS AGAINST ALL DEFENDANTS

102.    The Receiver realleges and incorporates by reference all of the foregoing paragraphs as if fully set forth herein.

103.    The Defendants benefited from the receipt of money from the Receivership Entities in the form of the Sarroff Transfers alleged herein which was the property of the Receivership Entities and their investors, and for which the Defendants did not adequately compensate the Receivership Entities or provide value.

104.    The Defendants unjustly failed to repay the Receivership Entities for the benefits received from the Sarroff Transfers.

105.    The enrichment was at the expense of the Receivership Entities and, ultimately, at the expense of the Receivership Entities' creditors.

106.    Equity and good conscience require full restitution of the monies received by the Defendants from the Receivership Entities on account of the Sarroff Transfers for distribution to the creditors.

107.    As a result of the foregoing, the Receiver, on behalf of the Receivership Entities and its creditors, is entitled to an award in an amount to be determined at trial.

**WHEREFORE**, the plaintiff, Jed Horwitt, Esq., as receiver for Sentinel Growth Fund Management, LLC, Radar Alternative Fund LP and Radar Alternative Master Fund SPC, respectfully requests the Court enter judgment in favor of the Receiver and against the Defendants, Alan L. Sarroff and A.L. Sarroff Management, LLC, as follows:

a.　　　Pursuant to §§ 52-552e(a)(1) and 52-552h, the avoidance of the Sarroff Transfers;

b.　　　Pursuant to §§ 52-552e(a)(2) and 52-552h, the avoidance of the Sarroff Transfers;

c.　　　Pursuant to §§ 52-552f and 52-552h, the avoidance of the Sarroff Transfers;

d.　　　Pursuant to § 52-552i(b), the recovery of the Sarroff Transfers or the value thereof from the Defendants as and to the extent the first transferee of such transfers, and each of the Defendants to the extent they were the person for whose benefit the transfer was made;

e.　　　An attachment or other provisional remedy against the assets transferred or other property of the transferees;

f.　　　A temporary restraining order and preliminary and permanent injunctions against further disposition by the Defendants and any subsequent transferees of the assets transferred or of other property;

g.　　　The appointment of a receiver to take charge of the assets transferred or of other property of the transferees;

h.　　　Reasonable attorneys' fees;

i.　　　All applicable pre-judgment and post-judgment interest;

22

j.      Costs; and

k.      Such other and further relief as the Court deems just and proper.

Dated at Bridgeport, Connecticut, this 13th day of November, 2017.

Respectfully submitted,

JED HORWITT, ESQ., RECEIVER

By:/s/ Stephen M. Kindseth
Stephen M. Kindseth (ct14640)
Patrick R. Linsey (ct29437)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, CT  06604
Telephone: 203-368-4234 X 245
Facsimile: 203-549-0903
Email: skindseth@zeislaw.com
       plinsey@zeislaw.com
His Attorneys