UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JED HORWITT, *Esq.*, *as Receiver for Sentinel Growth Fund Management, LLC, Radar Alternative Fund LP, and Radar Alternative Master Fund SPC*,<br>  *Plaintiff*,<br><br>v.<br><br>ALAN L. SARROFF, A.L. SARROFF MANAGEMENT, LLC, and A.L. SARROFF FUND, LLC,<br>  *Defendants*. | No. 3:17-cv-1902 (VAB) |

**RULING ON DISCOVERY DISPUTE**

On July 11, 2019, the Court held a telephonic discovery conference with Jed Horwitt, Esq. ("Plaintiff" or "the Receiver"), and Alan L. Sarroff, A.L. Sarroff Management, LLC ("Sarroff Mgmt."), and A.L. Sarroff Fund, LLC ("Sarroff Fund") (collectively, "Defendants"), to address a pending discovery dispute related to the testimony of two witnesses, Alan L. Sarroff and Larry Smith, in this action. Minute Entry, dated Jun. 11, 2019, ECF No. 130. The Receiver seeks to compel these witnesses, who were deposed in April 2019, to provide additional testimony that Defendants argue is protected from disclosure under the attorney-client privilege. Joint Motion for Status Conference, dated Jun. 7, 2019 ("Joint Mot."), ECF No. 115.

For the reasons explained below, the Court finds that the Receiver is not entitled to this additional testimony.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

Familiarity with the facts and prior proceedings, as detailed in the Court's May 10, 2019 Ruling denying Defendants' motion to transfer venue or dismiss this case, is assumed. *See* Ruling on Motion to Transfer Venue or Dismiss, dated May 10, 2019, ECF No. 102, at 1–14.

On June 7, 2019, the parties jointly moved for a telephonic discovery conference. Joint Mot. The parties sought the Court's aid in resolving "the Receiver's prospective motion to compel testimony (and the production of related documents) over Defendants' objection based on (i) the crime-fraud exception to the attorney-client privilege; and (ii) the alleged overbreadth of certain other attorney-client privilege assertions made by Sarroff and Larry Smith (Sarroff Management's Managing Member) at their depositions." *Id.* at 1. The parties argue that there are two issues to resolve: "(1) The application of the crime-fraud exception to certain communications between Sarroff, Smith and Defendant's counsel in late 2014 and late 2015;" and "(2) The application of the attorney-client privilege to certain matters concerning Sarroff's and Smith's knowledge and state of mind." *Id.* at 3.

On June 13, 2019, the Court granted the parties' motion, ordering them to submit short briefs by June 14, 2019, outlining their respective positions on the discovery dispute. Order, dated Jun. 13, 2019. The Court scheduled a telephonic discovery conference for June 18, 2019. *Id.*

On June 14, 2019, the Receiver filed his brief. *See* Plaintiff's Statement of Position Regarding the Application of the Crime-Fraud Exception to the Attorney-Client Privilege and Scope of the Attorney-Client Privilege, dated Jun. 14, 2019 ("Pl.'s Br."), ECF No. 118.

On June 15, 2019, Defendants filed their brief. Defendants' Statement Regarding the Application of the Crime-Fraud Exception to the Attorney-Client Privilege, dated Jun. 15, 2019 ("Defs.' Br."), ECF No. 129.

On June 17, 2019, the Court continued the discovery conference *sua sponte* to June 27, 2019. Notice of E-Filed Calendar, dated Jun. 17, 2019, ECF No. 123.

On June 25, 2019, the parties jointly moved to continue the discovery conference. Joint Motion, dated Jun. 25, 2019, ECF No. 126.

On June 26, 2019, the Court granted that motion and continued the discovery conference to July 11, 2019. Order, dated Jun. 26, 2019, ECF No. 127; Notice of E-Filed Calendar, dated Jun. 26, 2019, ECF No. 128.

On July 11, 2019, the Court held a telephonic discovery conference with the parties. Minute Entry, dated Jul. 11, 2019, ECF No. 130. The Court reserved its rulings as to the discovery dispute. *Id.*

## II. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action . . . the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).

But "district courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016). Indeed, "[a] trial court enjoys wide discretion in its handling of pre-trial discovery . . . ." *Cruden v. Bank of N.Y.*, 957 F.2d 961, 972 (2d Cir. 1992); *see In Re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008) (the district court has "wide latitude to determine the scope of discovery."); *Gen. Houses v. Marloch Mfg. Corp.*, 239 F.2d 510, 514 (2d Cir. 1956) ("The order of examination is at the discretion of the trial judge . . . .").

### III. DISCUSSION

#### A. Choice of Law

The claims in this action all arise under Connecticut law. *See* Second Am. Compl. The Receiver has alleged that jurisdiction in this action arises under 28 U.S.C. § 1367, because the claims here are related to the claims in the main receivership proceeding, *SEC v. Varacchi*, No. 3:17-cv-155 (VAB), and to property that is controlled by the Court. *See* Second Am. Compl. § 23 ("This Court has original jurisdiction over the SEC Action, to which the claims in this Action relate. Further, this Action concerns property under the Court's exclusive jurisdiction and the Receiver has brought this Action in furtherance of his appointment and in the performance of his duties as directed by this Court. Therefore, this Court has subject matter jurisdiction over this Action under 28 U.S.C. § 1367."); *see also* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").

Historically, the type of jurisdiction at play here—where state-law claims are filed in a separate action but said to be interrelated with the original, federal law claims from which jurisdiction is alleged to flow, and/or with the enforcement of court orders in the federal law action—has been described as an exercise of a court's "ancillary jurisdiction." *See, e.g.*, *Riehle v. Margolies*, 279 U.S. 218, 223 (1929) ("The appointment of a receiver of a debtor's property by a federal court confers upon it, regardless of citizenship and of the amount in controversy, federal jurisdiction to decide all questions incident to the preservation, collection, and distribution of the

4

assets. It may do this either in the original suit, or by ancillary proceedings.") (citations omitted); *Pope v. Louisville, N.A. & C. Ry. Co.*, 173 U.S. 573, 577 (1899) ("When an action or suit is commenced by a receiver, appointed by a circuit court, to accomplish the ends sought and directed by the suit in which the appointment was made, such action or suit is regarded as ancillary so far as the jurisdiction of the circuit court as a court of the United States is concerned; and we have repeatedly held that jurisdiction of these subordinate actions or suits is to be attributed to the jurisdiction on which the main suit rested, and hence that, where jurisdiction of the main suit is predicated on diversity of citizenship, and the decree therein is, therefore, made final in the circuit court of appeals, the judgments and decrees in the ancillary litigation are also final.") (collecting cases).

In 1990, Congress enacted 28 U.S.C. § 1367. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 557 (2005); *id.* at 583–84 (Ginsburg, J., dissenting). "Under 28 U.S.C. § 1367(a), federal courts have supplemental jurisdiction to hear state law claims that are so related to federal question claims brought in the same action as to 'form part of the same case or controversy under Article III of the United States Constitution.'" *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004); *see Exxon*, 545 U.S. at 583–84 (Ginsburg, J., dissenting) (explaining that the Supreme Court's decision in *Finley v. United States*, 490 U.S. 545 (1989), which partially abrogated *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), ultimately led the Federal Courts Study Committee of the Judicial Conference of the United States, established by Congress, to recommend enactment of a law overruling *Finley*, which Congress responded to by enacting § 1367).

The Second Circuit has recognized that an SEC receivership continues to provide a basis for ancillary jurisdiction over the Receiver's other actions. *See Eberhard v. Marcu*, 530 F.3d

122, 129 (2d Cir. 2008) ("Even where we have not approved of a receiver's actions, we have upheld the court's jurisdiction if 'the receiver's suit is to aid in the accomplishment of the ends sought and directed in the SEC action.'") (quoting *Esbitt v. Dutch-Am. Mercantile Corp.*, 335 F.2d 141, 142–43 (2d Cir. 1964)). But the Second Circuit did not address whether this ancillary jurisdiction is a sub-type of the supplemental jurisdiction created by 28 U.S.C. § 1367.[1] Indeed, the Second Circuit has more generally acknowledged that the "boundaries of ancillary jurisdiction are not easily defined and the cases addressing it are hardly a model of clarity." *Stein v. KPMG, LLP*, 486 F.3d 753, 760 (2d Cir. 2007).

In recent years, the Supreme Court has also observed that "the terms of § 1367 do not acknowledge any distinction between pendent jurisdiction and the doctrine of so-called ancillary jurisdiction." *Exxon*, 545 U.S. at 559. The Supreme Court has also noted that 28 U.S.C. § 1367 "codified the court-developed pendent and ancillary jurisdiction doctrines under the label 'supplemental jurisdiction.'" *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 598 (2018). And the Receiver, as noted above, asserts that jurisdiction in this action flows from 28 U.S.C. § 1367.

If the Receiver is correct, and the privileged material is relevant only to the state claims, the state's privilege law applies; but if it is relevant to both the federal and state claims, federal privilege law, as defined by federal common law, applies. *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) ("The complaint in the instant action alleges a federal

---

[1] There is very little other case law on this issue. The United States Court of Appeals for the Fourth Circuit has held that this branch of ancillary jurisdiction remains independent of § 1367 and is governed by case law, and has specifically invoked this in context of a receivership. *See Robb Evans & Assocs. v. Holibaugh*, 609 F.3d 359, 363 (4th Cir. 2010) ("Although § 1367 governs ancillary jurisdiction over *claims* asserted in a case over which the district court has federal subject matter jurisdiction, it does not affect common law ancillary jurisdiction 'over related *proceedings* that are technically separate from the initial case that invoked federal subject matter jurisdiction,' which remains governed by case law.") (quoting WRIGHT & MILLER, FED. PRAC. & PROC. § 3523.2 ("This section focuses not on supplemental jurisdiction over *claims* asserted in federal court but on jurisdiction over related *proceedings* that are technically separate from the initial case that invoked federal subject matter jurisdiction. This form of jurisdiction developed in case law as 'ancillary' or 'ancillary enforcement' jurisdiction. It seems clear that § 1367 does not apply to this form of jurisdiction.") (collecting cases)).

claim based on RICO and state law claims based on pendent and diversity jurisdiction. The evidence sought from Reynolds is relevant to both the federal and state claims. In such situations courts consistently have held that the asserted privileges are governed by the principles of federal law."); *see also, e.g.*, *Marsteller v. Butterfield 8 Stamford LLC*, No. 3:14-cv-1371 (AWT), 2017 WL 5769903, at *2 (D. Conn. Nov. 27, 2017) ("[I]n this case, in which subject matter jurisdiction is premised on a federal question, and the state law claims in issue (such as intentional infliction of emotional distress) are addressed under the Court's supplemental jurisdiction, the asserted privileges are governed by the principles of federal law.") (citation and internal quotation marks omitted).

Because there appears to be no significant substantive difference between Connecticut and federal law with respect to their treatment of the crime-fraud exception to attorney-client privilege, however, the Court need not decide which law is controlling here—nor opine on the broader question of whether this aspect of ancillary jurisdiction flows from § 1367. *See, e.g.*, *Olson v. Accessory Controls & Equip. Corp.*, 254 Conn. 145, 177 (2000) ("[W]e reject a strict burden shifting approach and instead employ the test adopted by the Court of Appeals for the Second Circuit, which requires a showing of probable cause to believe that the privileged communications were made with the intent to perpetrate a civil fraud and that the communications were made in furtherance of that fraud.") (citations omitted).

### B. The Crime-Fraud Exception under Federal and Connecticut Law

"Otherwise privileged communications are not protected from disclosure if they relate to client communications in furtherance of contemplated or ongoing criminal, fraudulent, or wrongful conduct." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *see Olson*, 254 Conn. at 155 ("[U]nder the crime-fraud exception, otherwise privileged communications may be

stripped of their privileged status if the communications have been procured with the intent to further a civil fraud.").

Under both federal and Connecticut law, the party seeking to defeat the attorney-client privilege through the crime-fraud exception bears the burden of showing there is probable cause to believe that: "(1) a fraud or crime has been committed; and (2) the communication in question was intended to further the fraud or crime." *Jacobs*, 117 F.3d at 87–88; *see also In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) ("[T]he crime-fraud exception applies only where there is probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity."); *Blumenthal v. Kimber Mfg.*, 265 Conn. 1, 18 (2003) ("The crime-fraud exception to the attorney-client privilege, therefore, is a limited one, and the burden of proof is on the party seeking to pierce the privilege . . . . The exception applies only after a determination by the trial court 'that there is probable cause to believe that a crime or fraud has been attempted or committed and that the [communication was] in furtherance thereof.'") (citing and quoting *Olson*, 254 Conn. at 172, 173).

"The crime-fraud exception to the attorney-client privilege cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in criminal activity." *In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986). Nor does it apply "simply because privileged communications would provide an adversary with evidence of a crime or fraud. If it did, the privilege would be virtually worthless because a client could not freely give, or an attorney request, evidence that might support a finding of culpability. Instead, the exception applies only when the court determines that the client communication or attorney work product in question was *itself* in furtherance of the crime

or fraud." *Richard Roe*, 68 F.3d at 40 (citing *Grand Jury Subpoenas*, 798 F.2d at 34); *accord Olson*, 254 Conn. at 175–76 (citing *Richard Roe*, 68 F.3d at 40).

### C. November 2014 Letter

The Receiver argues that a "fraud" was committed when, in November 2014, Bennett Last (Mr. Sarroff's "estate planning attorney of over 40 years") drafted a letter to Mr. Varacchi that, on its face, was merely an attempt to induce him to provide more transparency about the status of the Sarroff funds, and a threat to take legal action to obtain "administrative accounting reports immediately" from Sentinel and Mr. Varacchi. Pl.'s Br. at 1–2. After this letter was a written, Mr. Sarroff allegedly "made handwritten notes on this letter, which refer to a fictitious person named 'Bill at the Ramsey Fund' being 'on thin ice.'" *Id.* at 2. The Receiver therefore argues that this "fraud" gives him probable cause to compel both testimony and documents, regarding "all communications concerning [his] November 2014 letter to Sarroff, the non-existent 'Ramsey Fund', its fictious agent 'Bill' and the decision to communicate the letter to [Mr.] Varacchi." *Id.*

The Court disagrees.

Under the Receiver's theory, "[t]he involvement of an attorney to misrepresent facts for the purpose of inducing another person to provide information they were not otherwise willing to provide triggers the crime-fraud exception to the attorney-client privilege irrespective of whether the misrepresentations are criminal or cause damages." *Id.* (citing *Meyer v. Kalanick*, 212 F. Supp. 3d 437, 443–45 (S.D.N.Y. 2016)). This is so, the Receiver argues, because these misrepresentations violate an attorney's ethical duty not to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. *Id.* (citing *Meyer*, 212 F. Supp. 3d at 446; *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 135 (N.D.N.Y. 2007)).

9

While the Receiver is correct that, under both federal and Connecticut law, the "fraud" prong provides that the exception is not limited to instances of actual criminal conduct, neither the Second Circuit nor the Connecticut Supreme Court has ever recognized that prong to be as sweeping as the Receiver contends. To label as "frauds" all attorney "misrepresentations" allegedly undertaken to "induce another person to provide information they were not otherwise willing to provide" would allow the crime-fraud exception to subsume the attorney-client privilege in its entirety.[2]

---

[2] The cases cited by the Receiver are also readily distinguishable from the facts at issue here. In *Meyer*, the defendant's counsel was alleged to have made numerous misrepresentations in the course of interviewing "28 acquaintances or professional colleagues of plaintiff Meyer and plaintiff's counsel Schmidt," with the goal of uncovering disparaging or damaging personal and/or professional information about him. *Meyer*, 212 F. Supp. 3d at 440; *see also id.* ("[I]t is more likely, the Court finds (based on the facts detailed above), that the purpose of the investigation was to try to unearth derogatory personal information about Mr. Meyer and his counsel that could then be used to try to intimidate them or to prejudice the Court against them."). In addition, the court in *Meyer* explicitly found evidence of "arguably criminal" conduct. *See id.* at 447–48 ("Moreover, if Ergo's misrepresentations to sources were not sufficient evidence of the applicability of the crime-fraud exception, two additional features of Ergo's conduct highlight their conduct's impropriety. First, although Ergo was located in New York, Ergo, as previously noted, did not possess a private investigator's license to engage in its investigative activities, as required by New York law. Violation of this licensing provision may itself be prosecuted as a criminal misdemeanor . . . . Second, it is undisputed that Ergo's investigator Mr. Santos-Neves recorded his phone calls with sources without their knowledge or consent . . . . The Ergo investigator's recording of phone calls without the consent of his interlocutors was at worst illegal and, at best, evidence of reckless disregard of the risk of failing to comply with the law.").

All of this, however, was invoked by that court as a rationale for overcoming a claim of work-product protection for documents produced during that investigation—and not for gaining access to attorney-client communications. *See id.* at 448 ("For all of the reasons stated above, the Court denied Ergo and/or Uber's claim of work-product protection for Ergo communications that were responsive to plaintiff's subpoena (as narrowed by the Court)."). The court otherwise declined to require disclosure of attorney-client communications that the court found legitimately covered by privilege. *See id.* ("For example, the Court did not find that Mr. Kalanick's counsel, in making inaccurate representations to plaintiff's counsel about whether Uber had commissioned the Ergo investigation, acted with fraudulent intent. Rather, he was the victim of inaccurate representations made to him by Uber's in-house counsel that, while negligent (maybe even grossly negligent), did not evidence intentional falsity.").

In *NXIVM*, the attorney's conduct involved *ex parte* contact with an adversary represented by counsel, in a "sting operation" designed to "ensnare [the adversary] into divulging intimate litigation or business strategies by deceit." But the attorney was explicitly retained for this purpose, after the "sting" had already begun. In other words, his retention in the case as a whole was for the purpose of furthering the fraud. *See NXIVM*, 241 F.R.D. at 134 ("Succinctly, just to reiterate, in the later part of November 2004, NXIVM and Interfor concocted a plan to get Ross to talk about his defense in *NXIVM v. Ross et al.* and his intervention investigations which may have included NXIVM . . . . They continued this connivance by retaining Ross to intervene on behalf of this phony Zuckerman family and extended a $2,500.00 retainer to him . . . . After O'Hara had retained Interfor and a day prior to the release of the Ross Status Report, on November 22, 2004, Interfor and NXIVM representatives, including O'Hara, met. O'Hara made notes to himself about the various topics discussed and these notes are informative enough to illuminate the cabal's strategy to gather and collect information from Ross. On the first page of the notes are notations about the 'distraught mother' scheme. But beginning on the second page, emblazoned across the top of

Such a result would undermine the deep public interests underlying the attorney-client privilege. *See United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) ("The privilege's underlying purpose has long been 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'") (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

### D. 2015 Conversation

The Receiver also argues that Mr. Sarroff's colleague, Larry Smith, sought the counsel of Mr. Last and Steven Goldstein on "how to extort Mr. Varacchi in a manner that would help him plausibly deny that was his intention[.]" Pl.'s Br. at 5, 4. Specifically, on December 3, 2015, after Mr. Varacchi allegedly admitted falsifying a brokerage statement in order to overstate the value of Radar LP's brokerage account, a draft e-mail sent by Alan Sarroff to his colleague Larry Smith included language that indicated he had spent "over 4 hours on the phone with attorneys teaching me how not to write extortion letters like that." *Id.* at 4. Mr. Smith also allegedly (1) threatened to seek the assistance of a "childhood friend who is an agent of the United States Secret Service," (2) told Mr. Varacchi on December 22, 2015 that he "want[ed] $2 million dollars back or your world is over," and (3) told Mr. Varacchi and Mr. Rhodes on December 28, 2015 that "You can't say we didn't give you both the chance of a lifetime." *Id.* at 4–5. On December 29, 2015, Mr. Varacchi allegedly paid Mr. Sarroff $1.4 million. *Id.* at 5.

Based on all this, the Receiver argues there is "probable cause for the conclusion that [Mr. Smith] sought counsel's advice intending to extort Varacchi in the most discreet/deniable

---

these notes is the phrase 'Rick Ross Sting' followed by the observation that 'N & H [Nolan and Heller] can't participate because they represent NXIVM/ESP against Rick Ross et al-and he's represented by counsel.' Everyone should have known the parameters, and if not, at least attorney O'Hara should have known that an attorney cannot have any ex parte contact with an adversary who is represented by counsel. Any improper contact of this nature or naked disregard of a Discipline Rule may fall within the crime/fraud exception. A plan to ensnare Ross into divulging intimate litigation or business strategies by deceit may constitute a fraud.") (citations omitted).

11

manner," entitling the Receiver to "all communications concerning the four hours of discussion that Smith referred to and any other discussions concerning Smith's extortion and blackmail of Varacchi." *Id.*

The Court disagrees.

Even if the Receiver's recitation of the facts is true, and even if Mr. Smith's conduct did constitute "extortion and blackmail"—which is not obvious—he has not demonstrated probable cause to establish that, during the "four hours of discussion that Smith referred to," Mr. Last and Mr. Goldstein were advising Mr. Smith in furtherance of that conduct. Mr. Smith's ultimate use of that advice is not determinative. *See Grand Jury Subpoenas*, 798 F.2d at 34 ("The crime-fraud exception to the attorney-client privilege cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in criminal activity.").

"To subject the attorney-client communications to disclosure, they must actually *have been made with an intent to further an unlawful act.*" *Jacobs*, 117 F.3d at 88 (quoting *United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989) (emphasis added in *Jacobs*), *abrogated on other grounds*, *Loughrin v. United States*, 573 U.S. 351, 355 & n.2 (2014). In other words, the fact that Mr. Smith sought the advice of counsel and then failed to heed that advice does not subject that advice to disclosure. *See Jacobs*, 117 F.3d at 88 ("A wrongdoer's failure to heed the advice of his or her lawyer does not remove the privilege. The attorney-client privilege is strongest where a client seeks counsel's advice to determine the legality of conduct before taking action.").

As a result, the Receiver has not demonstrated that Mr. Smith had already determined to blackmail or extort Mr. Varacchi, when he sought the advice of counsel. *See Jacobs*, 117 F.3d at 88 ("With strong emphasis on intent, the crime-fraud exception applies 'only when there is

12

probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal activity.' It is therefore relevant to show that the wrong-doer had set upon a criminal course *before* consulting counsel.") (quoting *Grand Jury Subpoenas*, 798 F.2d at 34).

Because the Receiver has not shown probable cause that, when Mr. Smith sought out the "four hours of discussion," he had already "set upon a criminal course," his communications with counsel are not subject to disclosure under the crime-fraud exception.

### E. Sarroff and Smith Depositions

Finally, the Receiver argues that "Sarroff and Smith are required to disclose facts known to them and their state of mind at any given time regardless of whether they learned those facts from, or their state of mind is a product of, communications with counsel." Pl.'s Br. at 6 (citing *Johnson Matthey, Inc. v. Research Corp.*, No. 01 CIV. 8115 (MBM)(FM), 2002 WL 1728566 (S.D.N.Y. Jul. 24, 2002)). Counsel for Mr. Sarroff and Mr. Smith "instructed them not to answer questions that implicate these issues" during their depositions. *Id.* The Receiver therefore "requests that the Court overrule all privilege objections in these instances and compel Sarroff and Smith to answer these questions and any follow up questions." *Id.* (citing deposition transcript excerpts).

The Court agrees, as a general rule, that "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney[.]" *Upjohn*, 449 U.S. at 395.

But having reviewed the specific deposition excerpts cited by the Receiver, it does not appear that all of the questions asked were limited to uncovering such facts. Accordingly, where the Receiver's counsel directly inquired whether Mr. Sarroff and Mr. Smith asked Mr. Last

particular things, the privilege would apply because that is an inquiry into what Mr. Sarroff and Mr. Smith communicated to their attorney. *See Upjohn*, 449 U.S. at 396 ("The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.") (quoting *Philadelphia v. Westinghouse Elec. Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962)).

The Receiver has also not cited any clear authority for his assertion that Mr. Sarroff and Mr. Smith's "state of mind" when asking their counsel to do something would not be privileged. Indeed, "[t]he privilege's underlying purpose has long been 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Mejia*, 655 F.3d at 132 (quoting *Upjohn*, 449 U.S. at 389).

Accordingly, the Court will not overrule Defendants' objections.

## IV. CONCLUSION

For the reasons explained above, the Court finds that the Receiver is not entitled to the additional testimony sought and discussed at the July 11, 2019 discovery conference.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of August, 2019.

    /s/ Victor A. Bolden
Victor A. Bolden
United States District Judge