# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JED HORWITT, AS RECEIVER FOR SENTINEL GROWTH FUND MANAGEMENT LLC, RADAR ALTERNATIVE FUND LP, AND RADAR ALTERNATIVE MASTER FUND SPC,<br>        *Plaintiff,*<br><br>        v.<br><br>ALAN L. SARROFF, A.L. SARROFF MANAGEMENT, LLC, A.L. SARROFF FUND, LLC,<br>        *Defendants.* | No. 3:17-cv-1902 (VAB) |

## RULING AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

In this case, ancillary to a Securities and Exchange Commission ("SEC") criminal and civil action against Mark Varacchi for violations of federal securities laws, Jed Horwitt has been appointed as the Receiver ("the Receiver"). Order Appointing Receiver, *Sec. & Exch. Comm'n v. Varacchi*, Civ. No. 3:17-cv-155, ECF No. 12 (May 1, 2017).

Jed Horwitt, as the Receiver for Sentinel Growth Fund Management LLC, Radar Alternative Fund LP, and Radar Alternative Master Fund SPC, has filed a Complaint against Alan L. Sarroff, A.L. Sarroff Management LLC ("Sarroff Mgmt."), and A.L. Sarroff Fund, LLC ("Sarroff Fund"), (collectively, "Defendants"), and brought an intentional fraudulent transfer claim, a constructive transfer claim, and an unjust enrichment claim.

Both parties have moved for summary judgment; the Receiver on the intentional fraudulent transfer claims and the Defendants on all of the claims.

For the following reasons, the Receiver's partial motion for summary judgment and Defendants' motion for summary judgment are **DENIED**.

Accordingly, this case will proceed to trial on all three claims, and a separate order will issue regarding a scheduling conference on the filing of a Joint Trial Memorandum, and dates for trial.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

#### 1.  The Underlying Investment Scheme

Between September 2013 and December 2016, Mark J. Varacchi, through Sentinel Growth Fund Management, LLC ("Sentinel"), purported to offer investment opportunities into a master fund; investors' assets would be allocated to certain series within the master fund. Compl., *Sec. and Exch. Comm'n v. Varacchi*, Civ. No. 3:17-cv-155, ECF No. 1 ¶ 14 (Feb. 2, 2017) ("SEC Compl."). Mr. Varacchi also created two funds—the Radar Alternative Fund LP ("Radar LP") and the Radar Alternative Master Fund SPC ("Radar SPC"). *Id.* ¶¶ 12–13.[2] Mr. Varacchi and Sentinel offered two investment programs, an initial public offering program and a long-short or event-driven strategy. *Id.* ¶ 18.

But Mr. Varacchi and Sentinel eventually "divert[ed] investor money intended for investment in the Funds or in purported separately managed accounts and [ ] ma[de] unauthorized withdrawals from the Funds." *Id.* ¶ 21. "At least $2.95 million of these investors'

---

[1] The Court notes that Defendants have disputed almost every factual statement put forth from the Receiver. *See* Defs.' Local 56(a)2 Statement, ECF No. 215 (Jan. 18, 2020) ("Defs.' Opp'n SMF"). Defendants' primary objections are that portions of each statement include "inadmissible statements and information;" are "vague, ambiguous, or argumentative;" are not "concise;" are "legal conclusions;" or that documents referred to "speak for themselves." Rather than document every objection, the Court takes notice of these concerns and will mention select, more specific disagreements with the facts as presented by Receiver.

The Court also notes that, unless otherwise specified, the Receiver has admitted relevant statements of fact regarding Defendants' motion for summary judgment. *See* Defs.' Local 56(a)1 Statement, ECF No. 196 (Dec. 18, 2019) ("Defs.' SMF"); Pl.'s Local 56(a)2 Statement, ECF No. 203 (Jan. 17, 2020) ("Pl.'s Opp'n SMF").

[2] The civil Complaint provides background information on Mr. Varacchi's underlying activities and his subsequent guilty plea.

funds were never invested in the Funds or a separate account, and at least $1 million was redeemed from the Funds without authorization." *Id.* Mr. Varacchi and Sentinel concealed their fraud and misappropriation by manipulating investors' subaccounts. *Id.* ¶ 27. Mr. Varacchi and Sentinel commingled assets, made unauthorized withdrawals from the Fund, and used the money for personal and business expenses and to pay previous investors. *Id.* ¶ 30.

Sentinel "purported to offer several investment opportunities to third-parties." Pl.'s Local Rule 56(a)1 Statement, ECF No. 186 ¶ 1 (Dec. 17, 2019) ("Pl.'s SMF"). Investors signed "investment management agreements ('IMAs') pursuant to which Sentinel purportedly was to manage money that the investor deposited into either an account in the investor's name or a Sentinel discretionary advisory account." *Id.* ¶ 2. Defendants Sarroff Management and the Sarroff Fund signed such IMAs. *Id.*

Limited partnership interests in Radar Alternative Fund, LP ("Radar LP") also could be purchased. *Id.* ¶ 3. Radar LP "purportedly sought capital appreciation through a series of investment vehicles and strategies to be implemented by portfolio managers ('Portfolio Managers')." *Id.* Subscription agreements also were offered through Radar Alternative Onshore Fund LLC, "which were governed by a private placement memorandum, pursuant to which an investment manager would purportedly allocate investors' capital to 'one or more specific Series' run by third-party Portfolio Managers . . . ." *Id.* ¶ 4. The Portfolio Managers then would invest "through segregated portfolios of Radar Alternative Master Fund, SPC ('Radar SPC,' referred to along with Radar, LP as the 'Radar Funds,' and referred to collectively along with Sentinel as the 'Receivership Entities')." *Id.*

Sentinel "was not a registered investment advisor or broker/dealer[,]" but rather was "used to deposit and control the funds [Mr. Varacchi] received from investors, make transfers to

3

and from the Radar Funds, make transfers back to investors, . . . and misappropriate funds for personal and business purposes." *Id.* ¶ 5.  All investment activity "occurred in the Radar Funds' comingled brokerage accounts." *Id.* ¶ 6. Mr. Varacchi ultimately pled guilty to one count of conspiracy to commit securities fraud and wire fraud, one count of securities fraud, and two counts of wire fraud. *Id.* ¶ 7. At his plea allocution, Mr. Varacchi agreed to pay restitution in an amount set by the court. *Id.* ¶ 10.

### 2.   The Defendants

In 2012, Alan "Sarroff and Lawrence Smith formed the Sarroff Fund and Sarroff Management." Defs.' SMF ¶ 1. The Sarroff Fund maintained "an account with Weeden Prime Services, LLC ('Weeden')," which cleared through Goldman Sachs. *Id.* ¶ 3; Pl.'s Opp'n SMF ¶ 3 (denying clearing through Goldman Sachs & Co, as opposed to Goldman Sachs Execution & Clearing, LP ("GSEC")).

Not long after the formation of the Sarroff Fund and Sarroff Management, but before the Defendants had any relationship with Mr. Varacchi and his related entities, on August 22, 2013, Sentinel opened an account at Bank of America and deposited $54,000 from an investor. Pl.'s SMF ¶ 14. On August 23, 2013, Mr. Varacchi "began misappropriating these funds for his personal benefit." *Id.* As of September 23, 2013, Mr. Varacchi "had withdrawn so much of these funds for unauthorized purposes that he had overdrawn the account without making a single investment." *Id.* ¶ 15.

On September 24 and 25, 2013, two investors collectively deposited $2,050,000 into Sentinel's Bank of America account. *Id.* ¶ 16. Mr. Varacchi transferred $2,000,000 to the Radar LP brokerage account and then "spent over $14,000 of this money for business expenses." *Id.* More funds were deposited in Sentinel's account for investment purposes, but Mr. Varacchi

caused only a portion of those funds to be deposited into the Radar LP brokerage account. *Id.* ¶ 17. He wired more of those funds to himself and made additional cash withdrawals. *Id.*

From 2013 to 2016, Mr. Varacchi "misappropriated approximately $10 million from the Receivership Entities[.]" *Id.* ¶ 18. In total, "investors had net unredeemed principal deposits with the Receivership Entities in the amount of $19,731,953.81." *Id.* ¶ 19. Mr. Varacchi "had significantly over-stated the value of their investments" and the "statements that [Mr.] Varacchi provided to investors bore no relationship to the actual value of the assets in Sentinel's and the Radar Funds' accounts." *Id.* ¶ 22.

Although the investments were solicited for "separate and distinct investment vehicles through each of the Receivership Entities, [Mr.] Varacchi comingled the funds received" and placed a majority of the investor deposits in the Sentinel account. *Id.* ¶ 23. He would leave some of the funds in the Sentinel Account for personal expenses and other non-investment purposes. *Id.* Mr. Varacchi "also created the false appearance of value by causing the Radar Funds to purchase securities using margin . . . , and by using sub-accounts to conceal the debt incurred or the leverage used to purchase the assets." *Id.* ¶ 26.

The Radar Funds engaged in some legitimate securities transactions, but "their trades collectively lost money during the years 2014-2016 . . . and Sentinel never engaged in any investment trading activity." *Id.* ¶ 28; Defs.' Opp'n SMF ¶ 28 (objecting to the extent the statement "implies that the trading activity was minimal"). Mr. Varacchi funded redemption payments using funds taken from other investors, as evidenced through payments made where "Sentinel did not have the funds necessary to effectuate the payments that it made to investors without the infusion of new funds from other sources, including new investors or new money from existing investors." *Id.* ¶ 29; Defs.' Opp'n SMF ¶ 29 (objecting that the Receiver "has

offered no evidence that any investor requested to redeem their investments in whole or in part[,]" nor has the Receiver offered "evidence of a tracing analysis of Sentinel's Account statements or Radar's brokerage statements and no admissible evidence supporting the factual contentions in th[e] statement").

### 3. Relevant Transactions

On November 15, 2013, Mr. Sarroff received $7,425,000 from Radar LP and on November 25, 2013, received $25,000 from Sentinel. Pl.'s SMF ¶ 46. The payments were connected to "a three-day, $7.3 million loan to fund a day trading margin call in Radar LP's account." *Id.*; Defs.' Opp'n SMF ¶ 46 (objecting as the statement "contains hearsay and inadmissible information"); Pl.'s Opp'n SMF ¶ 18 (denying that the $25,000 was payment for the additional risk). "The 2013 Bridge Loan provided for repayment of the principal sum of $7.3 million and a $125,000 fee on November 15, 2013." Defs.' Opp'n SMF ¶ A.5. Weeden facilitated the Bridge Loan. Defs.' SMF ¶¶ 4–6.

Both the "principal and the loan fee were proposed by [Mr.] Varacchi" and the "additional $25,000 fee [was intended] to compensate [Mr.] Sarroff for the added risk[.]" Defs.' Opp'n SMF ¶ A.6–A.7; *see also* Pl.'s Opp'n SMF ¶ 11 (admitting that the "note contained some terms of the loan, but deny[ing] that it contained the terms as performed"); *see id.* ¶¶ 13–14 (denying that Mr. Varacchi proposed the terms of the loan and that the additional $25,000 was intended to compensate Mr. Sarroff for the added risk). The parties disagree as to whether "[t]he fees received by [Mr.] Sarroff for the 2013 Loan were commercially reasonable and consistent

with market conditions at the time." Defs.' Opp'n SMF ¶ A.11; Pl.'s Opp'n SMF ¶ 15 (denying that the fees received were reasonable).[3]

On February 4, 2014, Mr. Sarroff made "a new loan, again secured by a promissory note, to Sentinel, Rhodes and [Mr.] Varacchi, collectively[.]" Defs.' Opp'n SMF ¶ B.12; Pl.'s Opp'n SMF ¶ 22 (denying characterizing "the transaction as a 'loan' because Mr. Sarroff was to be paid, in part, based on purported trading profits" and denying "that the promissory note 'secured' a loan, because the promissory note evidenced (but did not secure) the loan"). Mr. Sarroff used $400,000 of his own funds for the loan. Defs.' Opp'n SMF ¶ B.14. "The 2014 Loan provided for repayment of the principal sum of $400,000 to [Mr.] Sarroff on February 19, 2014, a $15,100 fee, and a share of trading profits." *Id.* ¶ B.13.

After this payment, Defendants "repeatedly asked [Mr.] Varacchi for online access to the account, but he always refused." Pl.'s Opp'n SMF  25 ¶ 12; *see id.* at 25 ¶ 13 ("An investment manager's promise of transparency to induce an investment, coupled with the manager's failure to provide it after receiving payment, should prompt any reasonable investor to suspect and investigate fraud.").

On March 7, 2014, after depositing $1.2 million dollars into Sentinel's account, Mr. Sarroff received $415,195.80. Pl.'s SMF ¶ 30. Three days earlier, the same account "had a balance of negative $16.15[.]" *Id.*; Defs.' Opp'n SMF ¶ 30 (disputing that the payment was made with the other investors' money, but rather "the return of [Mr.] Sarroff's own principal that the

---

[3] Plaintiff argues that the explanations for the payment "were intrinsically inconsistent, vague and mutually exclusive with the documents and the parties' communications" and the payment, absent contractual obligation, "should have prompted a reasonable investor to suspect the possibility of fraud and investigate further." Pl.'s Opp'n SMF 24–25 ¶¶ 10–11.

Receiver admits [Mr.] Sarroff had deposited on February 5, 2014, and which the Receiver further admits remained in Receivership Entities' accounts as of March 7, 2014").

On February 19 and March 7, 2014, Sentinel paid Mr. Sarroff $19,794.86 and $415,195.80, respectively. *Id.* ¶ 47. "Sentinel made these payments in connection with a promissory note pursuant to which [Mr.] Sarroff lent Sentinel and [Mr.] Varacchi $400,000 for two weeks in exchange for a flat fee of $15,100, 10% annualized interest and 50% of any net trading profits." *Id.* The $19,794.86 transferred from Sentinel to [Mr.] Sarroff on February 19 "consisted of payment of the $15,100 fee, plus $4,696.86 in trading profits." *Id.* ¶ B.15; Pl.'s Opp'n SMF ¶ 25 ("denies that Defendants have presented any evidence to establish that any portion of the amount transferred by Sentinel corresponds with any actual trading profits"). The parties modified the terms of this loan "to extend the date on which [Mr.] Varacchi was required to return the $400,000 principal sum." Defs.' Opp'n SMF ¶ B.15.

On March 5, 2014, "the Receivership Entities possessed no less than $1.6 million of funds belonging to [Mr.] Sarroff." *Id.* ¶ C.33.

On March 7, 2014, "Sentinel transferred $415,195.80 to [Mr.] Sarroff, which consisted of repayment of the $400,000 principal of the 2014 Loan, $11,84.29 in interest and $3,331.51 in trading profits in accordance with its terms." *Id.* ¶ B.16; *see id.* ¶ C.35 ("On March 7, 2014, the Receivership Entities possessed sufficient funds belonging to [Mr.] Sarroff with which to make the payment of $14,195.80 to [Mr.] Sarroff to close out the February 2014 Loan."); Pl.'s Opp'n SMF ¶ 33 (denying for lack of evidence that the money transferred "actually consisted of trading profits or [Mr.] Sarroff's principal, as distinguished from funds taken from other investors").

In March 2014, Radar LP received $3.2 million in deposits, including $2.2 million from Mr. Sarroff. Pl.'s SMF ¶ 31. On March 31, 2014, "Radar LP transferred $850,000 to Sentinel,

which had a balance of $119,827.04 before the deposit." *Id.* Almost $700,000 was transferred to a different investor on April 1, 2014, meaning "Sentinel necessarily funded the April 1 payment to [the receiving investor] using Sarroff's or [the other depositing investor's] money or some combination thereof." *Id.*; Defs.' Opp'n SMF ¶ 32 (denying that "the Receiver has offered evidence of a tracing analysis of Sentinel's Account statements or Radar's brokerage statements").

In June and July of 2014, "[Mr.] Sarroff made two loans to Sentinel . . . for purposes of avoiding margin calls and both were repaid to [Mr.] Sarroff without incident." Defs.' SMF ¶ 41; Pl.'s Opp'n SMF ¶ 41 (denying the payment was to avoid a margin call and "that the money was repaid 'without incident'" as only $1.7 million of the $2.7 million June 2014 payment was repaid; $1 million remained with Sentinel; and denying that Mr. Sarroff personally funded either payment or that Sentinel received either payment).

In January 2015, the Defendants entered into a second IMA. *Id.* ¶ 45.

On February 1, 2015, Radar held $1,492,473.51 in its account. Pl.'s SMF ¶ 33. On February 25, 2015, Mr. Sarroff deposited $1 million into that same account. On February 26, 2015, "Radar transferred $1.7 million to Sentinel, which had a balance of $338,482.11 before it received the deposit and Sentinel transferred $2 million to Flatiron that same day[,]" meaning "Sentinel necessarily used at least a portion of [Mr.] Sarroff's money to pay Flatiron[.]" *Id.*; Defs.' Opp'n SMF ¶ 33 (denying for lack of tracing analysis).

On November 25, 2015, Mr. Smith "received a copy of the first page of an October 2015 Weeden account statement from [Mr.] Varacchi, which showed a balance of just under $4.2 million in the account as of October 31, 2015." Defs.' SMF ¶ 51; Pl.'s SMF ¶ 51 (denying only "that the document referred to was actually the first page of an authentic October 2015 Weeden

account statement, as distinguished from a forgery"). After examining the document, Mr. Smith asked for confirmation as to its authenticity. Defs.' SMF ¶ 52.

Mr. Smith eventually received permission to view the account. *Id.* ¶¶ 54–57. This account statement "showed a balance in the account of $1,045,667.69." *Id.* ¶ 57. Mr. Sarroff and Mr. Smith asked what had been done with the funds and for a return of the funds. *Id.* ¶ 58. Mr. Varacchi then "admitted that he had used [Mr.] Sarroff's funds to make loans to third-parties without [Mr.] Sarroff's permission, but assured [Mr.] Smith and [Mr.] Sarroff that the loans were callable." *Id.* ¶ 59.

Mr. Sarroff and Mr. Smith "demanded that [Mr.] Varacchi recall the loans, provide copies of the promissory notes and other documents evidencing the loans, copies of wire transfers showing the funds leaving Weeden in connection with the loans, information about the borrowers and copies of [Mr.] Varacchi's emails evidencing his requests to recall the loans." *Id.* ¶ 61. The parties dispute whether Mr. Smith and Mr. Sarroff "believed that [Mr.] Varacchi had loaned out [Mr.] Sarroff's funds to third-party borrowers." *Id.* ¶ 63; Pl.'s Opp'n SMF ¶ 63. Parties also dispute whether Defendants ever "believed or suspected that [Mr.] Varacchi was operating a Ponzi scheme or that any transfer was being made form the funds of other investors or was otherwise fraudulent." Defs.' SMF ¶ 67; Pl.'s Opp'n SMF ¶ 67.

On December 1, 2015, Mr. Varacchi informed the Defendants "that he had created and sent them a fraudulent brokerage statement for Radar LP's account and that he had misappropriated more than $3 million of their money." Pl.'s SMF ¶ 34.

On December 10, 2015, another investor deposited $500,000 with Sentinel for deposit into Radar LP's account. *Id.* ¶ 35. None of these funds were transferred to Radar LP's account. *Id.* Instead, Mr. Varacchi used them for business and personal expenses, "and caused Sentinel to

pay over $400,000 to other investors, including a total of $325,000 to [Mr.] Sarroff on December 10th and 11th, 2015." *Id.*

The parties dispute whether Mr. Smith and Mr. Sarroff "believed that [these] transfers of funds received by Sarroff Management on [Mr.] Sarroff's behalf beginning in December 2015 were nothing more than the return of [Mr.] Sarroff's own funds that had been loaned to third-parties by [Mr.] Varacchi." Defs.' SMF ¶ 70; Pl.'s Opp'n SMF ¶ 70.

On December 23, 2015, an investor "deposited $600,000 into Sentinel's Account for deposit into a Radar brokerage account." Pl.'s SMF ¶ 36. That same day, Mr. Varacchi "caused Sentinel to pay $500,00 to Sarroff Management[.]" *Id.* Days later, the same funds were used for his own personal expenses. *Id.* Before the December 23 deposit, "Sentinel's Account balance . . . was only $2,616.35." *Id.*

On December 28, 2015, after receiving a $1,500,000 deposit, "Sentinel promptly paid $1,400,000 to Sarroff Management." *Id.* ¶ 38. Sentinel's account had only $8,979.33 before the deposit. *Id.*; Defs.' Opp'n SMF ¶ 38 (denying "the Receiver has offered evidence of a tracing analysis of Sentinel's Account statements or Radar's brokerage statements supporting the factual contentions in this statement").

On January 7, 2016, after receiving a deposit from another investor, Sentinel paid $206,000 to other investors. Pl.'s SMF ¶ 40. $150,000 went to Sarroff Management. *Id.*; Defs.' Opp'n SMF ¶ 40 (denying "to the extent it implies that Defendants had any knowledge that the transfer to Sarroff Management in January 2016 were anything other than the return of [Mr.] Sarroff's principal").

On January 12, 2016, Mr. Varacchi "also caused Sentinel to . . . make an additional payment to Sarroff Management . . . in the amount of $25,000." Pl.'s SMF ¶ 41; Defs.' Opp'n

SMF ¶ 41 (denying to the extent statement implies Defendants knew that the money received was not a return of principal).

Between April 2014 and November 2015, "Sentinel made transfers to Sarroff Management[ ] . . . amounting to $7,306,768.57[.]" Pl.'s SMF ¶ 48.

On September 27, 2016, Sentinel transferred $23,000 to Raineri Jewelers "to purchase a watch for Lawrence Smith, the manager of Sarroff Management, ostensibly as an apology to Mr. Smith for lending out the Sarroff Defendants' money without their permission." *Id.* ¶ 49; Defs.' Opp'n SMF ¶ 49 (objecting for lack of admissible evidence and mischaracterization of deposition testimony, but otherwise not disputing Mr. Varacchi purchased the watch as a gift for Mr. Smith).

Sentinel was not required to be registered as a broker-dealer, nor was Mr. Varacchi required to be registered as an investment advisor. Defs.' Opp'n SMF ¶ C.21–C.22.

On December 13, 2016, Mr. Smith "was contacted by the SEC regarding its investigation into Sentinel." Defs.' SMF ¶ 77. Defendants participated on a call with the SEC about Sentinel; the parties dispute whether this was an attempt at cooperation with the SEC. *Id.* ¶ 78; Pl.'s Opp'n SMF ¶ 78.

On December 14, 2016, Mr. Smith "requested verification of [Mr.] Sarroff's capital from [Mr.] Varacchi, and received a statement from Weeden . . . that showed over $1 million in the account." Defs.' SMF ¶ 80. "The statement revealed overnight securities" not authorized to be in the account under the 2015 IMA. *Id.* ¶ 81; Pl.'s Opp'n SMF ¶ 81 (denying that "the 2015 IMA pertains to Radar LP's brokerage account or refers to Radar LP").

"On December 19, 2016, [Mr.] Smith requested that Weeden halt all trading in the account and liquidate all positions." Defs.' SMF ¶ 83.

On December 20, 2016, Defendants terminated their relationship with Sentinel. *Id.* ¶ 85.

### B. Procedural History

Familiarity with the prior proceedings, as detailed in the Court's prior rulings, is assumed. *See* Ruling on Mot. to Transfer Venue or Dismiss, ECF No. 102 at 1–14 (May 10, 2019); Ruling and Order on Mot. to Intervene and Mot. to Modify Scheduling Order, ECF No. 149 (Aug. 13, 2019).

On December 17, 2019, both parties submitted motions for summary judgment and accompanying exhibits. Pl.'s Mot. for Partial Summ. J., ECF No 184 (Dec. 17, 2019); Pl.'s Supp. Mem., ECF No. 185 (Dec. 17, 2019); Pl.'s Statement of Material Facts, ECF No. 186 (Dec. 17, 2019); Exs., ECF No. 187 (Dec. 17, 2019); Defs.' Mot. for Summ. J., ECF No. 188 (Dec. 17, 2019); Exs., ECF Nos. 191 & 192 (Dec. 17, 2019); Defs.' Corrected Supp. Mem., ECF No. 198 (Dec. 18, 2019); Defs.' Statement of Material Facts, ECF No. 196 (Dec. 18, 2019).

On January 17, 2020, Plaintiff opposed Defendants' motion for summary judgment. Pl.'s Mem. in Opp'n, ECF No. 210 (Jan. 17, 2020) ("Pl.'s Opp'n Mem."); Pl.'s Local Rule 56(a)2 Statement, ECF No. 203 (Jan. 17, 2020); Exs., ECF Nos. 206–209 (Jan. 17, 2020).

On January 18, 2020, Defendants opposed Plaintiff's motion for partial summary judgment. Defs.' Mem. in Opp'n, ECF No. 217 (Jan. 18, 2020) ("Defs.' Opp'n Mem."); Defs.' Local Rule 56(a)2 Statement, ECF No. 218 (Jan. 18, 2020).

On January 21, 2020, Plaintiff filed a corrected memorandum in opposition to Defendants' motion for summary judgment. Pls.' Corrected Mem. in Opp'n, ECF No. 220 (Jan. 21, 2020).

On February 7, 2020, Plaintiff filed a response in support of Plaintiff's motion for summary judgment. Pl.'s Reply, ECF No. 223 (Feb. 7, 2020).

On February 8, 2020, Defendants filed a response. Defs.' Resp. in Supp. of Summ. J., ECF No. 232 (Feb. 8, 2020) ("Defs.' Resp.").

On February 12, 2020, Plaintiff filed a sur-reply to Defendants' motion for summary judgment. Pl.'s Sur-Reply to Defs.' Mot. for Summ. J., ECF No. 239 (Feb. 12, 2020) ("Pl.'s Sur-Reply").

On February 18, 2020, Defendants filed a reply to Plaintiff's partial motion for summary judgment. Defs.' Sur-Reply to Partial Mot. for Summ. J., ECF No. 240 (Feb. 18, 2020) ("Defs.' Opp'n Sur-Reply"). Defendants also filed a reply to the Receiver's sur-reply on their pending motion for summary judgment. Defs.' Reply to Pl.'s Sur-Reply, ECF No. 242 (Feb. 18, 2020) (Defs.' Second Reply").

On July 30, 2020, the Court heard oral argument on the pending motions by videoconference. ECF No. 250 (July 30, 2020).

On August 7, 2020, following the telephonic motion hearing, both parties filed supplemental briefing. Pl.'s Mem. in Supp. of Mot. for Partial Summ. J., ECF No. 252 (Aug. 7, 2020) ("Pl.'s Suppl. Br."); Suppl. Mem. in Support of Mot. for Partial Summ. J., ECF No. 253 (Aug. 7, 2020) ("Def.'s Suppl. Br.").

On August 10, 2020, the Receiver filed a notice of supplemental authority. Suppl. Authority, ECF No. 254 (Aug. 10, 2020).

## II.   STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may

defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphases in original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be

granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967);
*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the
party opposing the summary judgment motion. *See Dufort v. City of N.Y.*, 874 F.3d 338, 343 (2d
Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and
draw all permissible factual inferences in favor of the party against whom summary judgment is
sought.'"). A court will not draw an inference of a genuine dispute of material fact from
conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011),
and will grant summary judgment only "if, under the governing law, there can be but one
reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

The Receiver seeks partial summary judgment on the intentional fraudulent transfer
claim. Defendants seek summary judgment on the intentional fraudulent transfer claim, the
constructive fraudulent transfer claim, and the unjust enrichment claim.

The Court will address these separate motions by addressing these three underlying legal
claims. Ultimately, resolution of all claims must await a trial.

### A.   The Intentional Fraudulent Conveyance Claim

"A fraudulent conveyance (or fraudulent transfer) action seeks to recover or avoid
transfers that wrongfully reduce the pool of assets available to creditors." *Picard v. Fairfield
Greenwich Ltd.*, 762 F.3d 199, 208 (2d Cir. 2014). Under the Connecticut General Statutes,

> (a) A transfer[4] made or obligation incurred by a debtor[5] is fraudulent as to a creditor[6], if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor[.]

Conn. Gen. Stat. § 51-552e(a)(1). While "[UFTA] provides a broader range of remedies than the common law [it] is largely an adoption and clarification of the common law of [fraudulent conveyances]. . . ." *Smith v. Marshview Fitness, LLC*, 191 Conn. App. 1, 9 (2019) (alterations in original) (quoting *Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 394–95 (2008)). "Actual fraudulent intent may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusual nature of the transaction." *Nat'l Council on Compensations Ins., Inc. v. Caro & Graifman, P.C.*, 259 F. Supp. 2d 172, 179 (D. Conn. 2003) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995)).[7]

This element also may be "satisfied by the Ponzi presumption which holds that [a]ctual intent to defraud is presumed as a matter of law when the debtor engaged in a Ponzi scheme because transfers made in the course of a Ponzi scheme could have been made for no purpose

---

[4] "Transfer" is defined as "every mode, direct or indirect, absolute or condition, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, and creation of a lien or other encumbrance." Conn. Gen. Stat. § 52-552b(12).

[5] "Debtor" is defined as "a person who is liable on a claim." Conn. Gen. Stat. § 52-552b(6).

[6] "Creditor" is defined as "a person who has a claim." Conn. Gen. Stat. § 52-552b(4).

[7] In considering actual intent, the statute encourages examining whether:

> (1) The transfer of the obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, . . . (5) the transfer was substantially all the debtor's assets, . . . (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of obligation incurred, . . .

Conn. Gen. Stat. § 51-552e(b)(1)–(11).

other than to hinder delay or defraud creditors." *Carney v. Illarramendi*, No. 3:12-cv-00165 (SRU), 2018 WL 1472510, at *11 (D. Conn. Mar. 26, 2018) (internal quotation marks omitted) (alteration in original); *see also Citizens Bank of Clearwater v. Hunt*, 927 F.2d 707, 711 (2d Cir. 1991) (a transferor's intent is "not ordinarily proven by direct evidence, but rather, by inference from other facts proven—the indicia or badges of fraud." (citations omitted)); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("badges of fraud" are facts or circumstances "so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent").

A plaintiff must prove fraudulent intent with "clear, precise and unequivocal evidence." *Certain Underwriters at Lloyd's*, 289 Conn. at 395 (quoting *Tyers v. Coma*, 214 Conn. 8, 11 (1990)). "The determination of whether a fraudulent transfer took place is a question of fact." *McKay v. Longman*, 332 Conn. 394, 417 (2019) (quoting *Certain Underwriters at Lloyd's*, 289 Conn. at 394–95).

"When transfers are made by corporations that are completely controlled by the wrongdoer, 'the transfers were, in essence, coerced.' . . . The corporation then becomes the creditor in the coerced transaction and a receiver for the coerced corporate has standing to claw back the transfers." *Carney v. Montes*, No. 3:12-cv-183 (SRU), 2014 WL 671263, at *8 (D. Conn. Feb. 21, 2014) (citations omitted); *see also Carney v. Horion Invs. Ltd.*, 107 F. Supp. 3d 216, 228 (D. Conn. 2015); *Carney v. Marin*, No. 3:12-cv-00181 (SRU), 2014 WL 1029911, at *6 (D. Conn. Mar. 17, 2014) (finding the receiver of entities which were bought by perpetrator of a Ponzi scheme was a creditor). Furthermore, "where actual intent to defraud creditors is proven,

the conveyance will be set aside regardless of the adequacy of consideration given." *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994) (analyzing New York law).

The Receiver first argues that the elements of fraudulent transfer have been met. The Receiver specifically points to the November 13 and 25, 2013, transfers, transfers to Sarroff Management's accounts totaling $7,306,768.57, and the September 27, 2016, transfer for a watch for Mr. Smith, as evidence of fraud. Pl.'s Supp. Mem. at 15–16. He then argues that "[t]he Receiver becomes a creditor for purposes of asserting a fraudulent transfer claim 'at the commencement of the [wrongdoer's] fraudulent scheme.'" *Id.* at 16 (quoting *Horion Invs. Ltd.*, 107 F. Supp. 3d at 229) (alteration in original). In his view, as the scheme started in 2013 and ran until its collapse in 2016, "the Receiver was a creditor of the Receivership Entities at the time of all transfers alleged in the Receiver's Third Amended Complaint[.]" *Id.*

Next, the Receiver argues that Mr. Varacchi caused the transfers with an actual intent to hinder, delay, and defraud the Receivership Entities, and that his guilty plea, and the forensic accounting of the relevant financial records, establish the existence of a Ponzi scheme. *Id.* at 19– 21. Finally, the Receiver argues that, beyond two payments,[8] "all transfers to the Sarroff Defendants from the Receivership Entities were made purportedly on account of investments." *Id.* at 22. Consequently, the payments "necessarily further[ed] the [Ponzi] scheme." *Id.*

In the Receiver's view, summary judgment is warranted on the "November, 2013 and February and March, 2014 payments to [Mr.] Sarroff to the extent that those payments exceeded the principal amount that [Mr.] Sarroff invested[,]" in the amount of $184,990.66. *Id.* at 23. Furthermore, under Second Circuit precedent, "the most a Ponzi scheme investor could ever retain, under any circumstances, is principal and an interest payment that was both guaranteed

---

[8] The $7,425,000 and $25,000 payments in November of 2013. Pl.'s Supp. Mem. at 22.

and reasonable." *Id.* at 24 (citing *Silverman v. Cullin*, 633 F. App'x 16 (2d Cir. 2016)). The Receiver argues that none of the transfers in November 2013 or February and March 2014 had reasonable interest rates. *Id.* at 24–25.[9]

Defendants argue that no caselaw supports the notion "that the 'debtor-transferor . . . utiliz[ing] after-acquired investment funds to pay off previous investors,' standing alone, was sufficient to prove the existence of a Ponzi scheme[.]" Defs.' Opp'n Mem. at 6 (citing *In re Dreier LLP*, No. 08-15051 (SMB), 2014 WL 47774 (Bankr. S.D.N.Y. 2014)). Defendants also argue that the Receiver relies on inadmissible evidence to support his assertion. *Id.* at 7 (arguing Mr. Varacchis's criminal information and plea allocution, the SEC Complaint, and the Receiver's expert affidavit should be excluded); *see id.* at 9 ("[Mr.] Varacchi admitted none of the facts essential to proving a Ponzi scheme.").

Specifically, with respect to the Receiver's expert, Keith D. Lowey, Defendants argue that the "affidavit is both the only evidence the Receiver has offered to prove the existence of a Ponzi scheme and [it is] utterly devoid of evidentiary foundation." *Id.* at 14. In Defendants' view, Mr. Lowey "did not perform a 'tracing analysis' of investor withdrawals from and deposits into the Receivership Entities' bank and brokerage accounts, except to cherry-pick[] just twenty-three examples over the span of more than two years indicating that an investor was repaid with new investor money . . . ." *Id.* at 16.

Defendants also argue that the contractual terms of the November 2013 and February 2015 bridge loans delineated "fees and nominal interest [that] were commercially reasonable[,]"

---

[9] The Receiver also notes that subsequent payments "exceeded the amount of principal contributed through Sarroff [M]anagement's account by at least $556,118.57" and it may recover "at least that amount in connection with those transfers." Pl.'s Supp. Mem. at 26 n.17. An issue of fact, however, exists "over whether Sarroff management received the transfers as an agent for [Mr.] Sarroff or the Sarroff Fund or whether [Mr.] Sarroff and/or the Sarroff Fund were persons for whose benefit the transfers were made." *Id.* Accordingly, "the Receiver does not seek to recover those payments through summary judgment." *Id.*

meaning the payments under the contract satisfied a debt and constitute "value" under § 52-552d(a). *Id.* at 19–20. Lastly, Defendants argue that, should the Court find the existence of a Ponzi scheme, "it should decline to apply the Ponzi scheme presumption" to Connecticut state law. *Id.* at 22.

The Receiver, in return, argues that Defendants' proposed definition of a Ponzi scheme contradicts with definitions applied by both the Second Circuit and Connecticut courts.[10] Pl.'s Reply at 2–3. In the Receiver's view, courts routinely use criminal informations or indictments to establish the existence of a Ponzi scheme, and, here, the Court need not reach the issue because the plea agreement and plea allocution are admissible evidence and also establish the scheme. *Id.* at 3.

The Receiver then lists Mr. Lowey's expert qualifications, *id.* at 4, argues the methodologies he used "are well accepted[,]" *id.* at 5, and denies that Mr. Lowey relied primarily on the SEC's analysis, because in three specific, relevant instances, "the SEC never provided that analysis to Plaintiff or Mr. Lowey[,]" *id.* (emphasis omitted).[11] In the Receiver's view, Defendants' expert Christopher Ekimoff's conclusions do not "raise [ ] triable issue[s] of fact concerning Mr. Lowey's conclusions . . . ." *Id.* at 8. The Receiver details Mr. Lowey's analysis to demonstrate how he reached the conclusions that Mr. Varacchi necessarily misappropriated money and paid Sarroff with other investors money in the spring of 2014. *Id.* at 10.

---

[10] The Receiver first notes that "Defendants only purport to deny that i) Sentinel was not a registered investment advisor; ii) it is impossible to trace the assets in the Radar Funds' accounts to any particular investor(s); and iii) Varacchi operate a Ponzi scheme" and that "Defendants waived nearly all of their boilerplate evidentiary objections by failing to brief them in their memorandum of law." Pl.'s Reply at 1 (internal citations omitted).

[11] The Receiver also notes that Defendants' expert, Mr. Ekimoff, "acknowledged during his deposition that many of his report's criticisms of Mr. Lowey's analysis were baseless—yet he curiously restated them in his sworn declaration." Pl.'s Reply at 7.

The Receiver continues that the "Second Circuit expressly embraces the Ponzi scheme presumption . . . . [and] courts in this district . . . universally apply the Ponzi scheme presumption of fraudulent intent to CUFTA claims." *Id.* at 11. He notes that if Defendants had a basis for certification to the Connecticut Supreme Court, "they would have sought certification long ago", *id.*, and that no basis for certification exists here as "Connecticut courts uniformly look to bankruptcy decisions for guidance interpreting CUFTA," *id.* at 12.

Lastly, the Receiver argues that "the annualized fees, interest and profits that [Mr.] Sarroff received related to the Nov. 2013 and Feb. 2014 Notes considerably exceeded 100% . . . . [and] the amounts expressly permitted under the already usurious Notes[.]" *Id.* at 14–15.

Defendants respond that they did, in fact, object "to the vast majority of the Receiver's Rule 56(a)(1) statement and briefed their objections in their Memorandum of Law[.]" Defs.' Opp'n Sur-Reply at 2. They review the legal arguments and evidentiary objections made in their memorandum. *Id.* at 2–5.

In supplemental briefing, the Receiver argues that no genuine issue of material fact exists that Mr. Varacchi and Mr. Rhodes operated a Ponzi because there is no dispute

> that they (i) required the constant infusion of capital from new investors to support the Receivership Entities' operations, conceal their embezzlement amounting to many millions of dollars and pay earlier investors their purported investment returns and capital when requested; (ii) falsified the Receivership Entities' performance; and (iii) co-mingled investor funds in Sentinel's, Radar LP's and Radar SPC's accounts without regard for the ostensible purpose of the

> investment arrangements agreed upon between investors . . . and
> Messrs. Varacchi and Rhodes[.]

Pl.'s Suppl. Br. at 1. The Receiver reiterates that Mr. Lowey identified instances where the
Receivership Entities had no other source of funds from which they could have lawfully made
payments to investors. *Id.*

In his view, the lack of tracing of actual deposits is immaterial to determining whether
there was a Ponzi scheme. *Id.* at 2. With respect to the Rhodes allocution, the Receiver argues
that "[s]tatements made by a prosecutor during an allocution are binding on, and attributable to, a
defendant if the defendant adopted or confirmed the statement, which includes instances where,
after the prosecutor's recitation, defense counsel confirms a portion of the prosecutor's statement
. . . ." *Id.* at 3 (quoting *United States v. Moreno*, 821 F.3d 223, 228–29 (2d Cir. 2016)). In effect,
Mr. Rhodes "admitted during his allocution that he and Mr. Varacchi used investor money to
'repay prior investors.'" *Id.* at 4. Finally, the Receiver argues that the Ponzi scheme began when
the fraud began and it is immaterial when precisely a payment to a previous investor from a new
investor's money was made. *Id.* at 4–5.

In Defendants' supplemental briefing, they argue that the "*Dreier* Trustee's failure to
engage an expert to perform a tracing analysis is a significant factor weighing *against* the
Receiver's motion for summary judgment." Defs.' Suppl. Br. at 3 (alteration in original).
"[C]herry-picking a few transfers purporting to show new investor funds were used to pay prior
investors in a considerably smaller sample size that one rejected as 'sparse' and 'incomplete' in
*Dreier* is insufficient to prove a Ponzi scheme." *Id.* at 4.

In their view, "[t]here is no basis . . . to conclude that Mr. Lowey's piecemeal exercise is
somehow more credible in establishing a Ponzi scheme just because the Receiver has labelled
him a Ponzi scheme 'expert' than the more fulsome analysis performed by the *Dreier* Trustee

that still was found to be incomplete and insufficient." *Id.* at 4. Furthermore, relying on "a handful of transactions among hundreds . . . has no precedent in the handful of cases that did not require extensive tracing analysis." *Id.* at 5.

The Court agrees that there are genuine issues of material fact as to whether the Ponzi scheme presumption should apply. As a result, these issues will have to be resolved at trial.

There is no dispute regarding the first two factors necessary for application of the Ponzi scheme presumption—that transfers of assets occurred or that the claim arose before the transfer. But there is a genuine issue of material fact as to whether there is sufficient admissible evidence to establish fraud or the existence of a Ponzi scheme.

### 1.      The Ponzi Scheme Presumption

As a preliminary matter, there is no one, all-encompassing definition of a Ponzi scheme. As one court noted several years ago:

> Numerous decisions have established two broad principles. First, the label "Ponzi scheme" has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud. Second, where funds acquired from the later investors are used to make payments to earlier investors in redemption of impaired or non-existence account balances and fictitious profits, 'actual intent' to hinder, delay and defraud is presumed.

*In re Bayou Grp., LLC*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) ("*In re Bayou Grp. I*") (internal citations omitted).

Indeed, "[t]he label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud." *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (S.D.N.Y. 2002) (citations omitted)." "The hallmark of a Ponzi

scheme is that the entity gives the false appearance of profitability by seeking investments from new sources rather than earning profits from assets already invested. . . . even if the scheme was somewhat cloaked by purportedly legitimate activities." *Carney v. Lopez,* 933 F. Supp. 2d 365, 380 (D. Conn. 2013); *see also United States v. Moloney*, 287 F.3d 236, 242 (2d Cir. 2002), *abrogated on other grounds by United States v. Cotton*, 535 U.S. 625 (2002) ("A Ponzi scheme by definition uses the purportedly legitimate but actually fraudulently obtained money to perpetuate the scheme, thus attracting both further investments and, in many cases, new investors to defraud.").

As a result, in determining if fraud, and a Ponzi scheme, are present, courts focus on factors such as "the absence of any legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling investor money, the use of agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, the 'payment' of excessively large fees to the perpetrator and the use of false financial statements." *In re Dreier LLP,* 2014 WL 47774, at *9; *see id.* ("These badges are, however, merely characteristics of many Ponzi schemes but a Ponzi scheme can exist without them."). The actions of the underlying scheme are important because "[a]lthough an action for fraudulent conveyance is brought against the transferee, the fraud is the debtor's." *Picard*, 762 F.3d at 209.

The Ponzi scheme presumption holds that "[a]ctual intent to defraud is presumed as a matter of law when the debtor is engaged in a Ponzi scheme because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *Lopez*, 933 F. Supp. 2d at 379 (internal quotation marks omitted).

On February 1, 2017, Mr. Varacchi pled guilty to securities fraud. Pl.'s Ex. F—Varacchi Plea Agreement, ECF No. 187-5 (Dec. 17, 2019); Pl.'s Ex. G—Varacchi Waiver and Plea, ECF

No. 187-6 (Dec. 17, 2019). The criminal information charged him with "employing devices, schemes and artifices to defraud" and misappropriating "funds that had been provided to the Hedge Fund by investors for the purchase and sale of securities, and then obtained funds from other investors in order [to] make payments to investors whose funds he had misappropriated." Pl.'s Ex. E—Varacchi Information, ECF No. 187-4 (Dec. 17, 2019).

In his own words, Mr. Varacchi admitted that he "falsely told investors that their funds would be invested with merging asset managers . . . this investment vehicle turned into a scheme in which [he] would misappropriate the investment funds for [his] personal benefit and for the benefit of others, and not for the benefit of the investors." Varacchi Waiver and Plea at 15:16–22.

One of Mr. Varacchi's associates, Jason Rhodes, also pled guilty to securities fraud and wire fraud. Pl.'s Resp. Ex. D—Rhodes Plea Allocution, ECF No. 223-5 (Feb. 7, 2020). He testified as to having been asked to and then having agreed to execute, disbursements from Sentinel's prime broker account. *Id.* at 29:7–10. On at least one occasion, he "knew those funds were diverted from investors and were fraudulently used to pay operating expenses and personal expenses." *Id.* at 29:15–17. He admitted employing "devices and schemes to defraud, in that we made untrue statements of material facts regarding the securities accounts of our clients." *Id.* at 29:18–21.

"Courts have consistently found that criminal proceeding admissions of a fraudulent scheme to defraud investors made in guilty pleas and plea allocutions are admissible as evidence of 'actual intent' to defraud creditors." *In Re Bayou Grp. II*, 396 B.R. at 845. But the plea allocutions of both Mr. Varacchi and Mr. Rhodes fall short of an admission of a crucial element of a Ponzi scheme: the use of new investor funds to pay older investors. *Cf. In re Dreier*, 2014

WL 47774 at 11 ("Marc did not admit, however, that he used the proceeds of the fraud to pay

back earlier investors, as the Indictment charged . . . ."); *see also In re Manhattan Inv. Fund*, 397

B.R. at 12 (finding support for the characterization of the underlying fraud as a Ponzi scheme

where the criminal information that the defendant pled guilty to set forth that he "continuously

falsified the Fund's performance, sent account statements to current investors that reflected

significant gains, concealed the Fund's true state from its auditors, and used his falsified records

to attract new investors").

There is no dispute that deposits were made by investors. Instead, the dispute is the extent

of Mr. Varacchi's legitimate business, whether the business operations produced profit, and

whether there were payments to old investors from the deposits of new investors. *See Armstrong

v. Collins*, Nos. 01 Civ. 2437 (PAC), 02 Civ. 2796 (PAC), 02 Civ. 3620 (PAC), 2010 WL

1141158, at *22 (S.D.N.Y. Mar. 24, 2010) (to prove defendant's engagement in a Ponzi scheme,

"the Receiver must establish 'that 1) deposits were made by investors; 2) the Debtor conducted

little or no legitimate business operations as represented to investors; 3) the purported business

operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to

investors was cash infused by new investors.'"

That Sentinel continued to maintain some legitimate business is not dispositive, but the

presence of fraud and the use of new investors' money to pay off old investors is. Similarly, if

Sentinel made a profit, but this profit was insufficient to cover debts owed, and Mr. Varacchi

manipulated accounts and deposits to avoid discovery of the difference between the profit made

and amounts owed to investors, then the acquired profit is less relevant.

Here, Mr. Varacchi continued to solicit and deposit money from new investors, but the

"Receivership Entities' assets under management never increased by more than $1.2 million on a

year over year basis." Pl.'s SMF ¶ 20 (while Defendants dispute this statement, they do so without citation to contrary evidence and fail to articulate why this evidence would be inadmissible at trial).[12] While legitimate securities transactions occurred, Sentinel never participated in any investment trading activity and the "Radar Funds['] . . . trades collectively lost money during the years 2014-2016 . . . ." *Id. ¶* 28.

The existence of some legitimate securities transactions, however, does not create a genuine issue of material fact as to whether the enterprise engaged in fraudulent activities amounting to a Ponzi scheme. The record evidence indicates that, on several occasions, there were differences in account balances, before and after deposits, and these differences show a lack of funds to make payments to some investors. Pl.'s SMF ¶¶ 28, 30–33, 35–38, 43.

The Receiver's expert, Mr. Lowey, reviewed the account balances, the dates of the deposits, and the dates of the withdrawals. Lowey Aff., ECF No. 187-30 ¶¶ 10–23. His analysis supports a finding of a Ponzi scheme. *Cf. In re Bayou Grp. II*, 396 B.R. at 837 ("To the contrary, the [expert] Report does not 'assume' insolvency—it **proves** insolvency using the actual financial data derived from all available source documents to show both actual assets and actual amounts invested." (emphasis in original)).[13] Based on his "forensic analysis of the books and

---

[12] Mr. Varacchi's plea, then, is further evidence of fraud. While he may not have uttered the words "Ponzi scheme" and may have engaged in some legitimate transactions, his guilty plea to securities laws violations is probative of him having acted and engaged in fraudulent behavior that required an influx of new money to hide losses and the fraud from pre-existing investors. *See also In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 12 (finding "ample support in the record" for characterizing the fraud as a Ponzi scheme where "the criminal information to which [perpetrator] pled guilty set for that [he] continuously falsified the Fund's performance, sent account statements to current investors that reflected significant gains, concealed the Fund's true state from its auditors, and used his falsified records to attract new investors").

[13] District courts act as gatekeepers to exclude unreliable expert testimony. FED. R. EVID. 702, Advisory Comm. Notes to the 2000 Amendments; *Kumho Tire Co v. Carmichael*, 526 U.S. 137, 141 (1999) ("We conclude that Daubert's general holding—setting for the trial judge's general gatekeeping obligation—applies not only to testimony based on scientific knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (internal citations omitted)); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

records of [Mr.] Varacchi and the Receivership Entities and other documents [ ] reviewed"
evidenced "that the activities of the Receivership Entities presented the essential characteristics
of and, in fact, constituted a Ponzi scheme," Mr. Varacchi "repaid earlier investors from the

---

Federal Rule of Evidence 702 establishes a two-party reliability test for determining the admissibility of expert testimony. FED. R. EVID. 702; *Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability."). First, the expert must be "qualified as an expert by knowledge, skill, experience, training, or education." FED. R. EVID. 702. Second, the expert's opinion must meet a four-part threshold test: (1) the opinion must "help the trier of fact to understand the evidence of to determine a fact in issue," (2) it must be based on "sufficient facts or data," (3) it must be "the product of reliable principles and methods," and (4) that the expert must have "reliably applied the principles and methods to the facts of the case" to derive the opinion." *Id.*

There is nothing in this record to suggest that Mr. Lowey does not qualify as an expert and that his expert testimony, through his affidavit, is not reliable. He is currently the President of Verdolino & Lowey, P.C. and originally joined the firm in 1990. Lowey Aff., ECF No. 187-30 at 13 (Dec. 17, 2019) (Ex. A to Lowey Aff—Mr. Lowey's CV). He "has repeatedly been engaged to examine the flow of investor funds, often times within a complicated corporate structure to determine if transactions are legitimate or part of a Ponzi-type investment fraud scheme." *Id.* His experience extends to various tax and accounting issues. *Id.* Mr. Lowey also is "a licensed CPA, Certified in Financial Forensics, and a Certified Insolvency & Restructuring Advisor . . . [and] was recently inducted as a Fellow in the American College of Bankruptcy." *Id.* He has made numerous related speaking engagements and acted as an expert, creating reports and giving testimony, since 2015. *Id.* at 13–14. His resume satisfies the first prong of the *Daubert* test.

Mr. Lowey's "opinions were formed based upon [his] independent review and analysis, at times with [his] staff's analysis, of bank and investment account statements and other documents provided to [him] in his capacity as financial advisor to the Receiver[.]" Pl.'s Resp. Ex. B—Lowey Aff., ECF No. 223-3 ¶ 5 (Feb. 7, 2020). He examined relevant filings, including related documents in the SEC/Varacchi action, and Mr. Varacchi's personal bank account statements, testimony, e-mails, Weeden account statements, Defendants' account statements, proofs of claim filed by investors, and judicial decisions concerning Ponzi schemes. *Id.* ¶ 9.

Mr. Lowey's evaluation explains the complicated, underlying financial transactions which were used to obscure the fraud. He relies on extensive facts and data for his analysis. Furthermore, in his deposition, Mr. Lowey testified to the methodologies and principles used in reaching his analysis. Pl.'s Resp. Ex. E—Lowey Dep., ECF No. 223-6 at 63:21–64:25; 65:12–66:25; 167:3–169:8 (Feb. 7, 2020). Mr. Lowey discussed the way he and his team approached the analysis and the methodologies used to conclude a Ponzi scheme existed. As a result, there is nothing in this record to suggest that he did not use reliable principles and methods, and reliably apply those principles and methods. Accordingly, on this record, there is nothing to suggest that he would not be qualified as an expert at trial and that the expert testimony, as provided in his affidavit, would not be admissible evidence. Defendants' arguments to the contrary, at least on this record, appear to go to the weight rather than the admissibility of his testimony. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony." (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (2d Cir. 1999)); *Frederick v. Deco Salon Furniture, Inc.*, 3:16-cv-00060 (VLB), 2018 WL 2750319, at *5 (D. Conn. Mar. 27, 2018) ("The Second Circuit has clarified that '[a]lthough expert testimony should be excluded if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

investments of more recent investors rather than from the proceeds of their underlying investments." Lowey Aff., ECF No. 223-3 ¶ 24.

But there are genuine issues of material fact as to whether Mr. Lowey's testimony is sufficient to apply the Ponzi scheme presumption as a matter of law. Defendants' expert, Christopher D. Ekimoff, *inter alia*, points out that Mr. Lowey selected "just twenty-three examples over the span of more than two years indicating that an investor was repaid with new investor money . . . ." Defs.' Opp'n Mem. at 16. While this claim underscores that Mr. Varacchi repaid old investors with new investor money, *cf. In re Dreier LLP*, 2014 WL 47774 at * 10 ("[T]he Trustee's proof has failed to show as a matter of law that Marc was repaying old investors with new investor money."), in Mr. Ekimoff's view, these twenty-three examples are a small sample size, given the hundreds of other transactions. Ekimoff Aff., ECF No. 213 ¶ 13 (Jan. 18, 2020); *cf. In re Dreier LLP*, 2014 WL 47774 at *10 ("Similarly, Dreier LLP made 160 transfers to the Funds on 35 different days, but the Trustee's analysis only focused on 26 transfers made on six days. Yet the Trustee seeks to recover profits under the 'net investment' approach which considers all of the transfers between the parties.").

As a result, the resolution of whether Mr. Lowey or Mr. Ekimoff has the better of the argument as to whether the actions of Mr. Varacchi warrant a Ponzi scheme presumption— genuine issues regarding material issues of fact—will have to await a trial. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); *Martin v. Shell Oil Co.*, 180 F. Supp. 2d 313, 317 (D. Conn. 2002) ("When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury." (citing *Sologub v. City of N.Y.*, 202 F.3d 175, 178

(2d Cir. 2000)); *cf. In re Dreier LLP*, 2014 WL 47774 at *12 (recognizing that denying summary judgment on the Ponzi scheme presumption "does not mean that the Trustee cannot prevail at trial without such an admission [that a Ponzi scheme was run] or undisputed evidence . . . .").

Accordingly, the Receiver's motion for partial summary judgment on the Ponzi scheme presumption issue will be denied.

### 2.     The Good Faith Defense

Good faith is an affirmative defense to a claim of fraudulent transfers; "[a] transfer or obligation is not voidable under subdivision (1) of subsection (a) of section 52-552e against a person who took in good faith and for reasonably equivalent value." Conn. Gen. Stat. § 552i(a). "The concept of a good faith transferee is embodied in both the UFTA and the Bankruptcy Act but defined in neither." *The Cadle Co. v. White*, No.203CV00030TPS, 2006 WL 798900, at *8 (D. Conn. Mar. 21, 2006).

"[I]n order to prove good faith, the transferee must show both that the transaction occurred at arms-length and that the transferee had no knowledge that the transaction would hinder, delay or defraud creditors." *Id.*; *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir. 1995) ("[A] transfer made without fair consideration constitutes a fraudulent conveyance, regardless of the intent of the transferor."). Finally, "bad faith does not appear to be an articulable exception to the broad principle that 'the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property." *Sharp Int'l Corp.*, 403 F.3d at 54 (quoting *Pashaian v. Eccelston Props.*, 88 F.3d 77, 85 (2d Cir. 1996)).

The related bankruptcy provision provides:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor . . . made such transfer or incurred such

> obligation with actual intent to hinder, delay, or defraud any entity
> to which the debtor was or became, on or after the date that such
> transfer was made or such obligation was incurred, . . .

11 U.S.C. § 548(a)(1)(A).[14] Under this statute, therefore, two conditions must be met: "(i) if the

transferee 'takes for value . . .' but only 'to the extent that such transferee . . . gave value to the

debtor in exchange for such transfer,' and (ii) if the transferee 'takes . . . in good faith.'" *In Re*

*Bayou Grp. II*, 396 B.R. at 844.

      "The debtor's actual intent to defraud 'need not target any particular entity or individual

as long as the intent is generally directed toward present or future creditors of the debtor." *In re*

*Lyondell Chem. Co.*, 554 B.R. 635, 640 (Bankr. S.D.N.Y. 2016) (quoting *In re Bayou Grp., LLC*,

439 B.R. 284, 304 (Bankr. S.D.N.Y. 2010) ("*In re Bayou Grp. III*")). "The presence of 'good

faith' depends upon, *inter alia*, 'whether the transferee had information that put it on inquiry

notice that the transferor was insolvent or that the transfer might be made with a fraudulent

purpose." *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 90 n.11 (2d Cir. 2014) (quoting *In*

*re Bayou Grp. III*, 439 B.R. at 310); *see also In re Bayou Grp.*, 396 B.R. at 844 (good faith

"must be determined according to an 'objective' or 'reasonable person' standard, and not on the

subjective knowledge or belief of the transferee"). "Whether a transferee was on 'inquiry notice'

may also be informed by, *inter alia*, the experience or sophistication of the transferee." *In re*

*Bayou Grp. II*, 396 B.R. at 845.

      Bankruptcy courts in the Second Circuit have wavered between applying a more stringent

inquiry notice standard, either objective or subjective, and a willful blindness standard. *See In re*

---

[14] Relevant to this discussion, "Section 548(a)(1) empowers a trustee to avoid the entirety of a fraudulent transfer, while [S]ection 548(c) provides an affirmative defense that allows a defendant to retain portions of that otherwise entirely avoidable transfer." *Secs. Inv'r Protection Corp.*, 499 B.R. at 423 (citation omitted). While SIPA may borrow or parallel this provision of the Bankruptcy Code, "[i]t does not necessarily imply that section 558(c)'s affirmative defense must apply in the same way to the customer property estate[, unique to SIPA,] as it would to the general estate." *Id.* at 424.

*Direct Access Partners, LLC*, 602 B.R. 495, 550 (Bankr. S.D.N.Y. 2019) (noting that "[s]ome

courts and commentators have held that 'good faith' is a subjective standard that focuses on the

actual mindset of the transferee," while "[o]ther courts, however, have held that 'good faith' is

not a subjective test at all, but instead is an 'objective' standard that is to be applied using not

only the actual knowledge and information that a transferee had, but also the knowledge and

information that a reasonably prudent person should have had under the circumstances.").

Additionally, the objective test has varied applications. *See HBE Leasing Corp.*, 48 F.3d

at 636 (construing the objective test as one for constructive knowledge and noting "[t]here is

some ambiguity as to the precise test for constructive knowledge. . . . While some cases have

stated that purchasers who do not make appropriate inquiries are charged with 'the knowledge

that ordinary diligence would have elicited,' . . . others appear to have required a more active

avoidance of the truth." (internal citations omitted)).

The willful blindness standard has been applied in cases governed by the Securities

Investor Protection Act ("SIPA"). *See generally Secs. Inv'r Protection Corp. v. Bernard L.*

*Madoff Inv. Sec. LLC*, 516 B.R. 18 (Bankr. S.D.N.Y. 2014) (applying a willful blindness

standard to a SIPA proceeding). Under the willful blindness standard, "a lack of 'good faith'

requires a showing that a given defendant acted with "'willful blindness' to the truth,' that is, he

'intentionally [chose] to blind himself to the 'red flags' that suggest a high probability of fraud."

*Id.* at 21 (citations omitted). "Willful blindness" is a "subjective standard." *Id.* at 23.

In contrast, under the inquiry notice standard, "[l]ower courts in [the Second] Circuit

have similarly held that inquiry notice of a debtor's possible insolvency suffices to impart

liability." *In re Bruno Mach. Corp.*, 435 B.R. 819, 849 (Bankr. S.D.N.Y. 2010) ((collecting

cases)). "'[K]nowledge of voidability' does not require 'complete understanding of the facts and

receipt of a lawyer's opinion that such a transfer is voidable; some lesser knowledge will do.'" *In re Thakur*, 498 B.R. 410, 420 (S.D.N.Y. 2013) (quoting *In re Bruno Mach. Corp.*, 435 B.R. at 849)). In this context, knowledge means "knowledge of 'sufficient facts that (i) puts the transferee on notice that the transfer might be avoidable or (ii) requires further inquiry into the situation and such inquiry is likely to lead to the conclusion that the transfer might be avoidable.'" *Id.* (quoting *In re Bruno Mach. Corp.*, 435 B.R. at 849)).

Under this standard, "a transferee cannot be found to have taken a transfer in good faith 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose." *In re Bayou Grp. II*, 396 B.R. at 845 (emphasis in original) (citations omitted).

Defendants "move for summary judgment on the second, third and fourth elements" of a Section 52-552e(a) CUFTA claim.[15] Defs.' Corrected Supp. Mem. at 6. If the Receiver can establish a *prima facie* case, in the alternative, Defendants argue that "he cannot recover against Defendants to the extent the transfer is received in good faith for value." *Id.* at 7. For each claim, Defendants argue that the Receiver must, and cannot, prove "that Radar was a creditor to Sentinel with a preexisting claim at the time of each transfer," "that each transfer from Sentinel to a Defendant was fraudulent as to Radar," and "that Radar was a creditor of Sentinel and that it had a claim against Sentinel that arose prior to each transfer." *Id.* at 8. Furthermore, "[t]o the extent the Receiver is seeking to avoid Sentinel's transfers on behalf of Radar as creditor to Sentinel, the Receiver must establish that the 'asset' Sentinel transferred to Defendants was ever

---

[15] "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor." Conn. Gen. Stat. § 52-552e(a).

the property of Sentinel." *Id.* at 9. In their view, the Receiver "cannot meet this burden, nor can he establish that Sentinel's transfers to Defendants 'diminish[ed] the assets of' Sentinel." *Id.*

Defendants also argue that, for their good faith for value defense, the Court should apply the same "standard required by federal securities laws." *Id.* at 12 (citing *Sec. Inv'r Prot. Corp*, 516 B.R. 18). Defendants argue that the underlying proceedings and charges "are predicated upon the federal securities laws." *Id.* at 15. In their view, requiring "an ordinary investor to perform due diligence upon an investment manager to avoid being penalized *for being defrauded* turns the securities laws inside out," and "willful blindness is the appropriate standard to apply . . . ." *Id.* at 16 (emphasis in original). They further argue that the willful blindness test would lead to a "virtually identical outcome were the Court to instead apply the 'objective test.'" *Id.*

Defendants argue that "they had no legal duty to perform due diligence at any time, no legal duty to recognize and act upon 'red flags,' and no further capacity to act upon them than they exercised." *Id.* at 26. They argue that "[n]either the Bridge Loan nor the fee it carried was unusual in the industry under the circumstances." *Id.* at 26. Defendants' inability to obtain third-party verification or account statements without Mr. Varacchi's approval did not "by itself, constitute inquire notice, let alone establish a 'high probability' of fraud." *Id.* at 27. Furthermore, in their view, Defendants did not "'deliberately avoid' learning the information about which they had limited transparency.'" *Id.*

They explain that, before the November 2015 account statement incident, "Defendants had [no] knowledge or basis to suspect that [Mr.] Varacchi had, first, actually used their funds to pay back prior investors or, second, paid back defendants from any source other than repayment of the loans," or Defendants' own money. *Id.* at 29. In their view, Defendants "had no reason to suspect Sentinel's syndicate trades were not bona fide." *Id.* at 31. "Even if Defendants had done

35

nothing to confirm the account statement in 2015, and even if, having ascertained that their money had been loaned out without their authorization, they had done nothing more than demand repayment, the Receiver could show no more than 'deliberate indifference.'" *Id.* at 32.

In response, the Receiver argues that "[t]he Second Circuit has expressly held that an objective, inquiry notice standard governs 'good faith' under § 550 of the Bankruptcy Code." Pl.'s Opp'n Mem. at 22. The Receiver continues, "other District Courts within the Second Circuit uniformly apply the inquiry notice standard of good faith to intentional fraudulent transfer actions asserted under the UFTA and the Bankruptcy Code . . . ." *Id.* at 23.

In the Receiver's view, Defendants "decided to invest with [Mr. Varacchi] without performing any due diligence and without exchanging any information with him other than the IMA, which Defendants now claim did not accurately reflect their agreement with [Mr.] Varacchi" and "furthered [Mr.] Varacchi's fraud by knowingly placing economically worthless securities trades with brokers to buy [Mr.] Varacchi's participation in the syndicate deals he used as a thin veil for his overarching fraud." *Id.* at 25. To the Receiver, Defendants' continued relationship with Mr. Varacchi, even after uncovering his fraud, in part, "clearly establish[es] that Defendants were on inquiry notice, [and] they can only establish a good faith defense if they can prove that they performed a reasonably diligent investigation or that doing so would have been futile to do so . . . ." *Id.* at 27.

Alternatively, the Receiver argues that, "at minimum, [Defendants] consciously turned a blind eye to Varacchi's fraud." *Id.* at 33.[16] The Receiver also argues that Defendants baselessly

---

[16] Referencing that "(i) [Mr.] Smith [k]new [Mr.] Varacchi's P&L's were 'bullshit' and that Varacchi lied about investment performance; (ii) he knew [Mr.] Varacchi fabricated a Weeden brokerage statement to cover up misappropriated funds; (iii) he threated to end [Mr.] Varacchi's world; (iv) Defendants thereafter continued to receive principal on an accelerated basis and additional purported profits and interest for almost a year after they affirmatively asked Khalid not to disseminate the fraudulent brokerage statement to Weeden (because they knew Weeden would have no choice but to shut the account down); and (v) they expressly did not care if Varacchi was stealing from other investors." *Id.*

36

claim that the Receiver "has not established that the transfers alleged . . . were made with Sentinel's and Radar LP's property." *Id.* at 34. The Receiver replies that "Defendants have not offered any evidence to suggest that the money they received belong to anyone other than Sentinel and Radar LP" and that his Local Rule Statement "establishes Radar's and Sentinel's ownership of the transferred funds immediately before they made the transfers." *Id.*

Defendants respond that "the Receiver has not formally pled Defendants' 'actual knowledge of,' let alone 'participation in,' [Mr.] Varacchi's alleged Ponzi scheme because he cannot, and on this Motion does not, support these allegations with one piece of admissible evidence." Defs.' Resp. at 1. Defendants reiterate that the willful blindness standard applies and argue that "the willful blindness standard is [not] a statutory emanation of SIPA." *Id.* at 2–3. Under the willful blindness standard, the red flags of fraud, which the Receiver relies on, would be insufficient to create liability. *Id.* at 10. Lastly, Defendants took steps to investigate after receiving the doctored Weeden account statement. *Id.* at 10–11. With respect to the inquiry notice standard, Defendants maintain they "cannot be 'on inquiry notice' when the standards and norms, indeed the *law*, of the securities industry relieve them of the duty to inquire." *Id.* at 11–12 (emphasis in original).

In his sur-reply, the Receiver argues first that "courts routinely extrapolate the ordinary § 548(c) standard to UFTA's good faith defense." Pl.'s Sur-Reply at 2. The Receiver also further explains contested factual allegations which would support his assertion that Defendants knew of and were aware of the Ponzi scheme. *Id.* at 2–5.

Defendants clarify their interpretation of relevant facts that the Receiver references to imply knowledge of the Ponzi scheme. Defs.' Second Reply.

Following the hearing, Defendants submitted supplemental briefing. Defs.' Suppl. Br. They argue that "SIPA does not refer to either good faith or willful blindness, nor does it contain any provision that 'conflicts' with the avoidance provisions of the Bankruptcy Code. . . . [and that] SIPA does not *preclude* the application of the willful blindndess standard." *Id.* at 2 (emphasis in original) (citing *Picard v. Katz*, 462 B.R. 447, 455 (S.D.N.Y. 2011) ("A securities investor has no inherent duty to inquire about this stockbroker, and SIPA creates no such duty."). Regarding the argument that the margin call should have put Defendants on inquiry notice, Defendants argue that "[t]here is no evidence in the record to support the Receiver's notion that a margin call equates to 'desperate circumstances' or imminent disaster.'" *Id.*

The Court agrees with the Receiver and will deny summary judgment as to the application of the good-faith defense. On this record, regardless of whether the inquiry notice standard or the willful blindness standard is applied, there are genuine issues of material fact which should be resolved by the finder of fact at trial, rather than by this Court at this stage of the case.

There are several transaction at issue here: (1) the Defendants' November 2013 loan to the Varacchi entities; (2) the Defendants' February 2014 loan to the Varacchi entities; (3) any transactions conducted between the Defendants and the Varacchi entities after November 25, 2015; and (4) the watch worth nearly a quarter of a million dollars given to Mr. Smith, the operations manager for the Defendants' businesses, as an "apology" for the questionable transactions that came to light on November 25, 2015.

Under the inquiry notice standard, the issue is whether any of these transactions resulted in "(i) put[ting] the [Defendants] on notice that the transfer might be avoidable or (ii) requires further inquiry into the situation and such inquiry is likely to lead to the conclusion that the

transfer might be avoidable." *In re Bruno Mach. Corp.*, 435 B.R. at 849. And the application of the inquiry notice standard involves "issues of fact that must be resolved by a jury." *In re Bayou Grp. III*, 439 B.R. at 328; *see id.* ("Here – in the event that a jury concludes that Appellants were on inquiry notice – it will be instructed to resolve material issues of fact both as to whether (1) the Appellants conducted a 'diligent investigation' under the circumstances; and (2) a diligent investigation would have uncovered Bayou's fraud."). On each of the transactions here, "issues of fact that must be resolved by a jury" abound.

As to the initial loans in November 2013 and in February 2014, there are issues of fact as to the commercial reasonableness of these loans and whether the Defendants should have investigated more before engaging in these transactions with Mr. Varrachi and any entities under his control. On this record, there are two contrasting views as to these two transactions. *Compare* Def.'s Ex. 82—Lowey Report, ECF No. 192-15 ¶ 26, 61 (Dec. 18, 2019) (describing characteristics of the 2014 loan, including the term and fees, which, on a yearly basis, would have resulted in a 105% return on Mr. Sarroff's $400,000 investment loan; noting that Sarroff received $37,340.66 from Sentinel, excluding a loan repayment), *with* Ekimoff Aff., ECF No. 227 ¶ 5 (Feb. 7, 2020) ("The November 2013 Loan and February 2014 Loan transactions are not, and never were, considered investments with the Receivership Entities, as they were loans supported by fully executed promissory notes between the Sarroff Defendants and the Receivership Entities."). While Defendants also argue that the views of their expert, Terry Travis, have more merit than the Receiver's expert, Joseph Esposito, *see* Travis Decl. ¶¶ 2–8; 13–14, ultimately, the jury must determine the credibility of their testimony, and what conclusions can or should be drawn about the propriety of these loans, not this Court, at this stage of the case. *See Zimmitti v. Aetna Life Ins. Co.*, 64 F. Supp. 2d 69, 80 (D. Conn. 1999)

("[The witness's] testimony concerning his evaluation of the plaintiff's qualifications also presented a credibility issue for the jury to resolve." (footnote omitted)).

In any event, the issue of commercial reasonableness is not resolved simply through a battle of the experts. "Commercial reasonableness hinges 'on the totality of the circumstances, including the good faith efforts of the creditor.'" *Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 12 Civ. 2827, 2016 WL 1267781, at *18 (S.D.N.Y. Mar. 30, 2016) (quoting *F.D.I.C. v. Wrapwell Corp.*, No. 93 CIV. 859 (CSH), 2002 WL 14365, at *9 (S.D.N.Y. Jan. 3, 2002)); *see also Pirrotti v. Respironics, Inc.*, 3:11-CV-00439, 2013 WL 321772, at *15 (D. Conn. Jan. 28, 2013) ("Further, the court is mindful that, '[c]ommercial reasonableness is normally a question of fact.'" (citation omitted)); *General Elec. Capital Corp. v. C&C Concrete Pumping, Inc.*, 10 Civ. 11371 (SAS), 2014 WL 12748887, at *4 (D. Conn. May 27, 2014) ("The reasonableness of a commercial resale is ordinarily a question of fact." (quoting *Gaynor v. Union Tr. Co.*, 216 Conn. 458, 478 (1990)).

A trial with the presentation of evidence through not only experts, but also the principal representatives of the Defendants would allow the "totality of the circumstances" involved to be considered by the jury in order to determine whether these transactions presented "red flags" warranting further inquiry by the Defendants. *See Sec. & Exch. Comm'n v. Smith*, 646 F. App'x 42, 45 (2d Cir. 2016) (recognizing that the timing of the transfers—"nearly a million dollars was transferred out of [a] [t]rust within two weeks of the freeze being lifted (with no previous transfers to the children) and that the bulk of the transfers" were used by a defendant to purchase a vacation home was sufficiently suspicious and constituted a badge of fraud); *United States v. Kattar*, 81 F. Supp. 2d 262, 271–72 (D.N.H. 1999) (issues of credibility were present where the government relied on a number of badges of fraud to prove fraudulent intent because the issue of

fraudulent intent, which turns on credibility, is not ordinarily resolved on a motion for summary

judgment); *In re Halperin*, 215 B.R. 321, 329–30 (Bankr. E.D.N.Y. 1997) ("It is clear from the

parties' contentions that the issue of the Defendant's intent is an unresolved issue of material

fact. In employing the badges of fraud, the Plaintiffs seek to have th[e] Court infer the

Defendant's intent from the circumstances. However, in the context of a summary judgment

motion to deny a discharge, the Court declines to rely on inferences alone in determining the

Defendant's intent.").

Even if these transactions were commercially reasonable, and raised no reasonable

suspicion at all, the continuing relationship between the Receivership Entities and the Varacchi-

controlled entities raised other issues, issues which should be resolved by a jury, and not this

Court.

As early as March 2014, Mr. Smith began asking for online account access and was

consistently refused. Pl.'s Opp'n SMF at 25 ¶¶ 12–13. The parties dispute whether this denial of

access and Defendants' continued and repeated inquiries for access indicates they should have

known to investigate. *Compare* Pl.'s Opp'n Mem. at 4 ("An investment manager's promise of

transparency to induce an investment, coupled with the manager's failure to provide it after

receiving payment, should prompt any reasonable investor to suspect and investigate fraud.");

Defs.' Resp. at 10–11 (actions taken by Defendants, including asking for online access, "are not

'deliberate actions to avoid learning of that fact' but precisely the opposite"). Again, on this

issue, while Defendants argue that the matter is straightforward, the inferences, if any, to be

drawn from these facts and whether these facts are sufficient to satisfy the inquiry notice

standard are for the jury to decide. *See Howley v. Stratford*, 217 F.3d 141, 151 (2d Cir. 2000) ("It

is not the province of the court itself to decide what inferences should be drawn . . . if there is

any evidence in the record for any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."); *Shannon v. Manson*, 596 F. Supp. 558, 565 (D. Conn. 1984) ("But the jury may infer the intent from the facts which have been proven and which, in their judgment, sufficiently evidences the intent which a person had in committing the act."). Similar issues of fact remain as to whether the March 2014 payments and terms were commercially reasonable.[17]

Defendants also requested confirmation of the authenticity of the screenshot of their account statement and Mr. Varacchi admitted impermissibly loaning the money to third-parties, in violation of the parties' IMA. Defs.' SMF ¶¶ 51–62. By December 2015, Defendants knew Mr. Varacchi had misappropriated $3 million of their money. Yet Defendants continued doing business with Mr. Varacchi, raising a genuine issue of material fact as to whether the Defendants were on inquiry notice as to possible fraud. *Cf. HBE Leasing Corp.*, 48 F.3d at 637 (knowledge of diversion of funds to other sources "should have been sufficient to alert Clemence to the danger that Enterprises might improperly funnel to third parties the money she was advancing, and she should have made reasonably diligent inquiries into the use of the mortgage proceeds.").

Finally, Mr. Varacchi gave an expensive watch to Mr. Smith, the operations manager for the Defendants' businesses, as an "apology" for the questionable transactions that came to light on November 25, 2015. Certainly, whether this "gift" was commercially reasonable or should put Defendants on inquiry notice of an ongoing fraud should be resolved by the jury, and not this Court. *Cf. id.* at 640 ("Because a fact-finder might reasonably conclude that the purpose behind

---

[17] Although some of the payments may have satisfied "a valid contractual antecedent debt . . ," it is possible that "the redemption payments at issue here of non-existent investor account balances as misrepresented in fraudulent financial statements were themselves inherently fraudulent and constituted an integral and essential component of the fraudulent Ponzi scheme . . . ." *In re Bayou Grp. I*, 362 B.R. at 638.

this arrangement was to hinder, delay, or defraud Enterprises' future judgment creditors, the District Court should not have dismissed Petitioners' claims against the Attorneys at this stage in the proceedings.").

In all, the record evidence creates a genuine issue of material fact as to what exactly Defendants knew, when they knew it, and what they should have done about what they knew, all credibility determinations within the purview of the jury, *see Ryan v. Judicial Branch of Conn.*, 2014 WL 12569528, at *1 (D. Conn. Apr. 8, 2014) ("The Court, however, may not make credibility determinations." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)), and affecting the availability of the good faith defense to the Defendants, if the inquiry notice standard is applied*, see, e.g. Armstrong*, 2010 WL 1141158 at *27 ("There are disputed questions of fact which bear on the question of the Collinses' good faith defense to the actual fraud claims. The questions of fact pertain to the point in time the Collinses were on notice of sufficient facts 'to induce a reasonable person to inquire' into the suspicious nature of the transfers they were receiving from Yagalla." (citing *In re Cohen*, 199 B.R. 709, 719 (B.A.P. 9th Cir. 1996))).

Under the willful blindness standard, "a lack of good faith requires a showing that a given defendant acted with willful blindness to the truth, that is, he intentionally [chose] to blind himself to the red flags that suggest a high probability of fraud." *Secs. Inv'r Protection Corp.*, 516 B.R. at 21 (citations and internal quotation marks omitted). Defendants argue that this higher standard should apply here. But even if it does, in a context outside of the SIPA, summary judgment in their favor would not be the result.

As a preliminary matter, to the extent that the willful blindness standard applies, it should not apply to all of the relevant transactions at issue here. This standard has been applied in SIPA

cases, and arises from the notion that a "securities investor has no inherent duty to inquire about his stockbroker, and nothing in SIPA creates such a duty." *Id.* at 22 (citations and internal quotation marks omitted). As further explained in *Secs. Inv'r Protection Corp.*, given SIPA's twin objectives of inspiring "investor confidence" and "securities market stability," "in the context of securities transactions such as those protected by SIPA, the inquiry notice standard . . . would be both unfair and unworkable." *Id.*

But this case involves not just securities transactions but loans–and in one instance, the gift of a watch. There is nothing in *Secs. Inv'r Protection Corp.* or its predecessor ruling, *Picard v. Katz*, suggesting that the willful blindness standard should apply to the November 2013 "short-term bridge loan to cover a day trading margin call," Sarroff Decl. at 2, ¶ 9, or the February 2014 loan "secured by a promissory note between Alan Sarroff, as 'Lender' and Sentinel, Rhodes, and Varacchi, collectively as 'Borrower,'" *id.* at 4, ¶ 28. These loans – as well as the gift – are not related to the underlying concerns of "investor confidence" and "securities market stability" at issue in those decisions.[18]

These loan transactions were separate and apart from the other agreements Mr. Varacchi and Sentinel held with other investors. *See* Ekimoff Aff., ¶ 5 ("The November 2013 Loan and February 2014 Loan transactions are not, and never were, considered investments with the

---

[18] "As a general matter, a SIPA trustee is 'vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11.'" *Sec. Inv'r Protection Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 499 B.R. 416, 419–20 (Bankr. S.D.N.Y. 2013) (quoting 15 U.S.C. § 78fff-1(a)). "[I]n particular, [ ] SIPA empowers a trustee to recover and distribute to the debtor broker-dealer's customers 'customer property,' as defined as 'cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.'" *Id.* at 420 (quoting 15 U.S.C. § 78*lll*(4)). "[T]o the extent that SIPA limits the Trustee's avoidance powers to those transfers that are 'void or voidable' under the Bankruptcy Code, that provision merely gives the Trustee the authority to rely on section 548(a)(1)(A). It does not necessarily imply that section 548(c)'s affirmative defense must apply in the same way to the customer property estate as it would to the general estate." *Id.* at 424.

Receivership Entities, as they were loans supported by fully executed promissory notes between the Sarroff Defendants and the Receivership Entities."); *see also Secs. Inv'r Protection Corp.*, 476 B.R. at 720 ("[T]he definition of securities contract includes, *inter alia*, 'a master agreement that provides for an agreement or transaction referred to in clause (i)'—*i.e.*, 'a contract for the purchase, sale, or loan of a security'—and 'any security agreement . . . related to any agreement or transaction referred to in this subparagraph, including any guarantee or reimbursement obligation by or to a stockbroker.'" (quoting 11 U.S.C. § 741(7)(a)(i), (x), & (xi)); *see id.* (finding agreements to qualify as "securities contracts" where agreements they were to be performed "through securities trading activities," authorized the purchase and sale of stocks, and made numerous references to securities transactions); *see also In re Bernard L. Madoff Inv. Secs. LLC*, 773 F.3d 411, 418 (2d Cir. 2014) ("Thus, the term 'securities contract' expansively includes contracts for the purchase or sale of securities, as well as any agreements that are *similar* or *related* to contract for the purchase or sale of securities." (emphasis in original)).

Indeed, Mr. Sarroff, who "traded shares in initial public offerings ("IPOs") and secondaries extensively," Sarroff Decl. at 1, ¶ 2., in an over forty-year career as a member of the New York Stock Exchange, *id.*, admitted having no "prior experience making short-term bridge loans to cover day trading margin calls, or any other lending experience," *id.* at 3, ¶ 18.

Thus, to the extent that the willful blindness standard should apply here, it should apply only to any securities transactions between the Defendants and Mr. Varacchi and entities under his control. But the willful blindness standard is a "subjective standard," and summary judgment is not appropriate on this record. *Secs. Invs. Protection Corp.*, 516 B.R. at 21. For securities transactions conducted between the Defendants and the Varracchi entities after November 25, 2015, when the Defendants knew Mr. Varacchi had taken $3 million out of their accounts, at the

very least, there is a genuine issue of fact as to whether 'intentionally [chose] to blind himself to the 'red flags' that suggest a high probability of fraud." *Id.* (citations omitted) (alteration in original). The circumstances surrounding Defendants' decisions to nevertheless continue doing business with Mr. Varacchi and whether they constitute willful blindness should be resolved at trial. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Accordingly, the Defendants' motion for summary judgment on its good faith defense will be denied.

**B.    The Constructive Fraudulent Transfer Claim[19]**

"[A] transfer is constructively fraudulent if the debtor 'received less than a reasonably equivalent value in exchange for such transfer or obligation; and was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." *In re M. Fabrikant & Sons. Inc.*, 480 B.R. 480, 485 (Bankr. S.D.N.Y. 2012) (quoting 11 U.S.C. § 548(a)(1)(B)). "Instead, '[l]ack of consideration, or inadequate consideration for a debtor's conveyance, coupled with the existence or prospect of other unpaid creditors, triggers the 'fraud in law' theory in which intent to hinder, delay or defraud is presumed from the circumstances." *Armstrong*, 2010 WL 1141158, at *20 (citations omitted); *cf.*

---

[19] Counts Three and Seven are also brought under Conn. Gen. Stat. § 52-552f, which states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Conn. Gen. Stat. § 52-552f. Connecticut courts typically analyze claims under Sections 52-552e and 52-552f "together, as a single claim." *Chorches v. Catholic Univ. of Am.*, No. 3:16-cv-1964 (MPS), 2017 WL 4638589, at *2 (D. Conn. Oct. 16, 2017).

*In re Bernard L. Madoff Inv. Sec. LLC.*, 2012 WL 5511952, at *1 (S.D.N.Y. Nov. 14, 2012) (considering a claim under New York's similar statute and noting "the constructive fraudulent conveyance claims require either a showing of a lack of 'reasonably equivalent value for the transfer' . . . or a lack of 'fair consideration' (DCL), which can be demonstrated by showing a lack of either 'fair equivalent property' or 'good faith.'" (quoting *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330, 333 (Bankr. S.D.N.Y. 2011)). "[F]raud is inferred when a certain set of factual circumstances occur." *The Cadle Co.*, 2006 WL 798900, at *11; *see also Armstrong*, 2010 WL 1141158, at *20 ("[C]onstructive fraud 'does not require any showing of fraudulent intent.'" (citation omitted)).

Defendant argues "that $14.45 million of the alleged $15,192,409 in 'Sarroff Transfers' was not merely 'reasonably equivalent value' but actually equivalent value." Defs.' Corrected Supp. Mem. at 38. The "payment of interest and fees pursuant to the parties' contracts satisfies an antecedent debt under Section 52-552d(a) and is therefore for value." *Id.* at 39.

The Receiver "agrees with Defendants that he may not recover on his constructive fraudulent transfer claims . . . to the extent that Defendants establish the amount of value each of them provided to the Receivership Entities[,]" but a question remains as to who, Mr. Sarroff individually or Sarroff Management, invested with the Receivership Entities. Pl.'s Opp'n Mem. at 35. In his view, "[u]ntil/unless Defendants can establish on whose behalf Sarroff Management provided value to the Receivership Defendants, the Defendants cannot establish value for purposes of obtaining summary judgment on Plaintiff's constructive fraudulent transfer claims or

unjust enrichment claims." *Id.* Nor can Defendants obtain summary judgment "to the extent that the payments Sarroff Management received exceeded Defendants' principal." *Id.*

The Court agrees.

"In determining whether the debtor received reasonably equivalent value, the court must look at what value the debtor received in return for the transfer. The court must then determine whether the 'value' received is reasonably equivalent;" a question of fact. *Armstrong*, 2010 WL 1141158, at *20 ("Whether reasonably equivalent value has been given 'is typically a question of fact.'" (quoting *Wachovia Secs., LLC v. Neuhauser*, 528 F. Supp. 2d 834, 859 (N.D. Ill. 2007))). "Satisfaction of an antecedent debt is explicitly acknowledged by C.G.S. § 52–552d(a) to be 'value' for purposes of fraudulent transfer analysis. Thus, the individual satisfaction flowing from each [p]ayment provided 'reasonably' . . . equivalent value in exchange for such [p]ayment." *In re All-Type Printing, Inc.*, 274 B.R. 316, 324 (Bankr. D. Conn. 2002).

Here, the issue is whether fair value was conferred or exchanged. The payments may have satisfied the fees and constituted antecedent debt, depending on the recipient of payments, including whether they went to the appropriate defendant. While there was admittedly no value transferred when Mr. Varacchi bought Mr. Smith a watch, the circumstances around the remaining transactions create a genuine issue of material fact as to the value exchange and whether the exchanges were commensurate. *See In re Jesup & Lamont, Inc.*, 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014) ("[I]f at the time of a transfer there is a chance that the transfer 'will generate a positive return,' value will be conferred. Further, if that value approximates the value of what the debtor transferred, there will be reasonably equivalent value." (citation omitted)).

"Whether a transfer is for reasonably equivalent value is largely a question of fact, the determination of which perforce depends on all the circumstances surrounding the transaction."

*In re Actrade Financial Tech. Ltd.*, 337 B.R. 791, 803 (Bankr. S.D.N.Y. 2005) (quoting *Am. Tissue Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 105 (S.D.N.Y. 2004)). "To decide whether funds were exchanged for a reasonably equivalent value, the court is required to determine the value of what was transferred compared to the value of what was received." *In re LXEng LLC*, 607 B.R. 67, 95 (Bankr. D. Conn. 2019) (citing *Coan v. Fleet Credit Card Servs., Inc. (In re Guerrera)*, 225 B.R. 32, 36 (Bankr. D. Conn. 1998)).

And there is "the issue of whether the payment of interest by a Ponzi scheme operator can ever constitute reasonably equivalent value." *In re Carrozzella & Richardson*, 286 B.R. 480, 487 (D. Conn. 2002); *see id.* at 488–89 ("to allow the investors in these fraudulent schemes to keep payments in excess of their actual investments would allow them to profit at the expense of those investors who entered the scheme later and received nothing[,]" and considering "whether the debtor was really indebted to the investors depends on whether or not they had a valid, enforceable right under their agreement to receive the payments"). "The transferee of an alleged fraudulent conveyance that takes for value may retain any interest transferred to the extent the transferee gave value, but only if he acted in good faith." *In re Actrade Fin. Tech. Ltd.*, 337 B.R. at 804–05.

Given that the extent of Defendants' knowledge of the fraud and when they should have known of it is disputed, and that issues regarding the application of the Ponzi scheme presumption and good faith will await trial, these remaining questions of fact support denying Defendants' motion for summary judgment. *See id.* at 806 (denying a motion to dismiss where the trustee "alleged that the debt repaid . . . was incurred in connection with transactions that were, at a minimum, irregular," thus "adequately alleg[ing] that [defendant] had 'actual or constructive knowledge of [a] fraudulent scheme' in connection with the incurrence of debt"

(citing *Miller v. Forge Mech. P'ship Ltd.*, 2005 WL 267551, at *6 (S.D.N.Y. Feb. 2, 2005)); *In re Globe Tanker Servs., Inc.*, 151 B.R. 23, 24–25 (Bankr. D. Conn. 1993) ("[T]ransfers made or obligations incurred solely for the benefit of third parties do not furnish reasonably equivalent value, . . . unless the debtor's net worth is unaffected because it received a direct or indirect economic benefit from the transfer." (citations omitted) (alteration in original)).

Accordingly, Defendants' motion for summary judgment on the constructive fraudulent transfer claim will be denied.

## C.     The Unjust Enrichment Claim

Unjust enrichment is "a broad and flexible remedy," "[w]ith no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006). "[L]ack of a remedy under [a] contract is a precondition for recovery based upon unjust enrichment." *Alstom Power, Inc. v. Schwing Am., Inc.*, No. 3:04cv1311 (JBA), 2006 WL 2642412, at *5 (D. Conn. Sept. 14, 2006) (quoting *Gagne v. Vaccaro*, 255 Conn. 390, 401 (2001)).

Recovery is possible "when a contract remedy is unavailable, to the extent that the defendant has unjustly profited at the plaintiff's expense." *Geriatrics, Inc. v. McGee*, 332 Conn. 1, 24 (2019) (citations omitted). A plaintiff therefore cannot plead a claim of unjust enrichment if he also pleads the existence of an express contract. *See Alstom Power, Inc.*. at *5–6; *Levy v. World Wrestling Entm't, Inc.*, No. 3:08–1289 (PCD), 2009 WL 455256, at *2–3 (D. Conn. Feb. 23, 2009) (granting a motion to dismiss on an unjust enrichment claim and finding that an unjust enrichment claim could not be pled simultaneously with allegations indicating the existence of a valid, express contract (citation omitted)); *see also Meaney v. Conn. Hosp. Ass'n, Inc.*, 250 Conn. 500, 517–18 (1999) ("it is often said that an express contract between parties precludes

recognition of an implied-in-law contract governing the same subject matter." (citations omitted)).

In order to recover for unjust enrichment, a plaintiff "must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Vertex, Inc.*, 278 Conn. at 573. "A claim for unjust enrichment is an equitable claim. In matters of equity, the court is one of conscience which should be ever diligent to grant relief against inequitable conduct, however ingenious or unique the form may be." *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 459 (2009). "Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, . . . a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit." *New Hartford v. Conn. Resources Recovery Auth.*, 291 Conn. 433, 468 (2009).

Defendants argue that the Receiver cannot "establish that Defendants, whom he does not dispute the Receivership Entities defrauded, unjustly received payment of their own money from the Receivership Entities, unjustly failed to give their own money back to the Receivership Entities and cannot now, in justice, be permitted to keep their own money." Defs.' Supp. Mem. at 39. Furthermore, the "Receiver also admits that the overwhelming majority of the money he is seeking in unjust enrichment from these admitted victims was their own principal." *Id.* at 40.

The Receiver's arguments are similar to his arguments in the constructive fraudulent transfer claim—"Defendants must establish that one or more of them had the right to payment from the Receivership Entities in the amounts that Sarroff Management received." Pl.'s Opp'n Mem. at 35–36. The Receiver also argues that the "contracts entered into in furtherance of a

Ponzi scheme . . . are unenforceable against Plaintiff." *Id.* at 36 (citing *Sender v. Buchanan (In re Hedged-Inv. Assocs.*), 84 F.3d 1286, 1290 (10th Cir. 1996)).

The Court agrees.

For the same reasons as stated above regarding the constructive fraudulent transfer claim, Defendants' unjust enrichment claim depends on which Defendants actually received payments and what payments they received, issues to be resolved at a trial.

Accordingly, Defendants' motion for summary judgment on the unjust enrichment claim will be denied.

## IV.   CONCLUSION

For the following reasons, the Receiver's partial motion for summary judgment, and Defendants' motion for summary judgment are **DENIED**.

Accordingly, this case will proceed to trial on all three claims; the intentional fraudulent transfer claim, the constructive fraudulent transfer claim, and the unjust enrichment claims. A separate order will issue regarding a scheduling conference on the filing of a Joint Trial Memorandum, and dates for trial.

**SO ORDERED** at Bridgeport, Connecticut, this 11th day of September, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE